FILED
United States Court of Appeals
Tenth Circuit

November 7, 2016

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

HARDSCRABBLE RANCH, L.L.C.,
f/k/a Farley Ranch, L.L.C.,

Plaintiff - Appellant,

v.

UNITED STATES OF AMERICA,

Defendant - Appellee.

No. 15-1438

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D.C. No. 14-CV-00426-REB-MJW)

James Cage (and Bethany A. Johnson, Esq. of Moye, White, L.L.P, on the briefs),
Denver, Colorado, for Plaintiff - Appellant.

Jacob Licht-Steenfat, Assistant U.S. Attorney, (and John F. Walsh, United States
Attorney, on the brief), Denver, Colorado, for Defendant - Appellee.

Before **KELLY**, **BRISCOE**, and **GORSUCH**, Circuit Judges.

**KELLY**, Circuit Judge.

Plaintiff-Appellant Hardscrabble Ranch, L.L.C. appeals from the district

court's grant of summary judgment in favor of the government. Hardscrabble

sued the government under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§

2671–2680, in connection with the Forest Service's response to the Sand Gulch Fire, which damaged Hardscrabble's land. The district court held that the discretionary function exception to the FTCA barred jurisdiction. Hardscrabble Ranch, LLC v. United States, No. 14-cv-00426-REB-MJW, 2015 WL 5307992, at *6 (D. Colo. Sept. 11, 2015). Finding jurisdiction to hear the appeal under 28 U.S.C. § 1291, we affirm.

Background

On April 26, 2011, lightning ignited a wildfire in the Wet Mountains of Colorado, in a remote area of the San Carlos Ranger District in the Pike and San Isabel National Forests, and the Cimarron and Comanche National Grasslands ("PSICC"). When the United States Forest Service ("USFS") responded, the fire was still small and could have been extinguished then and there.

The USFS instead instituted a partial suppression strategy, with the twin goals of allowing the fire to continue burning on Forest Service land while at the same time containing the fire from spreading onto private property, which bordered about half a mile to the east. This decision was made for a number of reasons: the area was remote, so the danger to firefighters would be high if the fire took off; there were already control features such as rock formations and a nearby highway that would help contain the fire; and a snow storm was predicted to arrive on April 29, which would help suppress the fire. Additionally, because

- 2 -

the area had not burned in thirty to sixty years, a significant amount of fuels had accumulated in the form of mature ponderosa pines and continuous undergrowth and mountain brush. The USFS thought that a controlled burn of this area would be helpful in reducing the amount of fuel available for a subsequent fire. These decisions, and the reasons for them, were documented in a formal Incident Decision on April 29.

Later that same day, high winds in advance of the snow storm caused the fire to jump the containment lines the USFS had created, and the fire grew from covering 25–30 acres to a size of more than 200 acres. The USFS issued a new Incident Decision on April 30 to change to a full suppression strategy. That evening the predicted snow came and partially smothered the fire. By the time the fire was declared fully contained on May 4, it had burned 496 acres. About 154 of those were owned by Hardscrabble Ranch.

Hardscrabble contends that the USFS failed to follow numerous policies, regulations, and protocols in its handling of the fire, and that as a result the government is responsible for the harm caused to the Ranch. The parties disagree about which documents controlled, whether they were followed, and what amount of discretion each document gave to the USFS.[1]

---

[1] As explained below, because the USFS claims that Hardscrabble Ranch has not identified a policy or regulation that precludes the exercise of discretion so as to fit within the bounds of the FTCA, and because we can resolve the case on this basis, it is unnecessary to detail here the additional documents the USFS says applied.

According to Hardscrabble Ranch, two main documents controlled: (1) the amended 1984 Land Resource Management Plan for the PSICC ("LRMP"), and (2) the PSICC Fire Management Plan.[2] Aplt. Br. at 8. The LRMP provides general guidance for land and resource management activities for a particular forest, including the underlying basis for fire management objectives. 3 Aplt. App. 000317. In 2008, the LRMP was amended to specify that "naturally-ignited wildland fire may be used in predetermined areas under specified conditions" to achieve ecological objectives and to reduce the adverse impacts of potential wildfires over the long-term. Id. The areas in question were designated "predetermined areas," as were all USFS lands in the Wet Mountains. Id. The LRMP itself did not, however, define what the "specified conditions" were.

As part of the 2008 amendment process, the USFS completed an Environmental Assessment ("EA") to evaluate the proposal of changing from a model where all wildfires are fully suppressed to one where, under certain conditions, lightning-ignited fires could be used to accomplish resource management objectives. 8 Aplt. App. 000884–95. Specifically, the EA noted that "[t]he purpose of this action is to reintroduce, where desirable and feasible, the natural role of fire in maintaining the proper functioning and health of natural

---

[2] The USFS agrees that the Land Resource Management Plan applied, but disagrees that the Fire Management Plan was a "decision-making document"; instead, the USFS contends that the Fire Management Plan simply consolidated all the guidance from other plans into a single document. Aplee. Br. at 14–15.

communities, and to reduce the long-term threat of catastrophic wildfires. The proposed action may allow some naturally ignited fires to reduce fuel loading and reintroduce lower-intensity fires back into forest and grassland ecosystems." Id.

In response to public concern that a wildfire might get out of hand under this new method, the EA included a Design Checklist from the 2005 Implementation Guide to help Forest Service personnel respond appropriately:

Decision Checklist for considering [wildland fire use]

Is there a threat to life, property, or public and firefighter safety that cannot be mitigated? [Yes / No]

Are potential effects on cultural and natural resources outside the range of acceptable effects? [Yes / No]

Are relative risk indicators and/or risk assessment results unacceptable to the appropriate Agency Administrator? [Yes / No]

Is there other proximate fire activity that limits or precludes successful management of this fire? [Yes / No]

Are there other Agency Administrator issues that preclude wildland fire use? [Yes / No]

Id. at 000893. According to the EA, "[a] 'Yes' response to any element on the checklist indicates that the appropriate management response should be suppression-oriented." Id. (emphasis omitted). Additionally, even if a fire meets the above criteria, the fire must be "monitored and managed under a specific Wildland Fire Implementation Plan (WFIP) and evaluated daily for conformance to that plan. If negative resource impacts start to occur, or if the fire moves into

areas where it is not desired[,] suppression actions will be initiated on all, or portions of[,] the fire." Id.

The other document Hardscrabble Ranch points to is the PSICC Fire Management Plan. Aplt. Br. at 11. This document is referenced in the summary of the EA for the amendment to the LRMP: the USFS "propose[s] to manage lightning ignited fires to accomplish specific resource management objectives in pre-determined areas and under pre-approved conditions as outlined in a Fire Management Plan." 8 Aplt. App. 000884. According to certain deposition testimony, however, the applicable Fire Management Plan was not updated along with the LRMP to specify the "pre-determined area[s]" and "pre-approved conditions" necessary for wildland fire use. 7 Aplt. App. 000740–42; 8 Aplt. App. 000842–43.

## Discussion

We review the district court's grant of summary judgment de novo. Fowler v. United States, 647 F.3d 1232, 1237 (10th Cir. 2011). Summary judgment is appropriate when there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In applying this standard, we view the evidence in the light most favorable to the nonmoving party — here, Hardscrabble Ranch. Fowler, 647 F.3d at 1237.

In the FTCA, Congress waived aspects of the government's sovereign

immunity so that the United States can be held liable in tort "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674. Then Congress carved out exceptions to this waiver. Id. § 2680. Relevant here is the discretionary function exception, which excepts from the waiver "[a]ny claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." Id. § 2680(a). As the Supreme Court has explained, this exception "marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals." United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines), 467 U.S. 797, 808 (1984).

Because the discretionary function exception is jurisdictional, the burden is on Hardscrabble Ranch to prove that it does not apply. See Elder v. United States, 312 F.3d 1172, 1176 (10th Cir. 2002); see also 28 U.S.C. § 1346(b)(1). To do this, Hardscrabble must satisfy the two-part test of Berkovitz v. United States, 486 U.S. 531, 536–37 (1988). First, it must show that the action was not "a matter of choice for the acting employee." Id. at 536. For example, if a regulation or policy "specifically prescribes a course of action for an employee to follow," there would be no discretion for the employee: he would have no choice but to follow the directive, so the discretionary function exception would not

apply. Id. Second, even if the conduct in the first step was discretionary, it must nevertheless be the kind of discretionary judgment the exception was "designed to shield." Id. That is, the discretionary action or decision must be based on considerations of public policy. Id. at 537. If it is not, then even though the conduct might be discretionary, it would not be excepted from the waiver of immunity. "In sum, the discretionary function exception insulates the Government from liability if the action challenged in the case involves the permissible exercise of policy judgment." Id.

A.      Discretionary Action

Hardscrabble Ranch contends that the USFS did not have discretion in this case about how to respond to the Sand Gulch Fire. It argues that this is not because the USFS would never have discretion in how to fight a fire, but because that discretion would only come into play after certain mandatory procedures were followed. Aplt. Br. at 24. And here, Hardscrabble Ranch says, the USFS never followed those procedures, so it never got to the point where it could take discretionary action. Id.

Hardscrabble Ranch specifically points to the Decision Checklist contained in the EA to the LRMP amendment as an example of the kind of mandatory procedure the USFS failed to apply. According to the argument, the USFS was required to complete this checklist before responding to a fire because the answers to the checklist questions would tell the USFS what discretionary action

was allowed. That is, if the answer to the first question — "Is there a threat to life, property, or public and firefighter safety that cannot be mitigated?" — is "yes," then no discretion would exist; the only response allowed would be suppression-oriented. Conversely, if the answer to that question was "no," then the USFS might have discretion in how to proceed, depending on the answers to the other questions and the applicable policies in other documents.

Hardscrabble Ranch relies on this construct to make three arguments. First, the USFS did not have discretion as to whether to complete the checklist before responding to the fire, yet the USFS never completed the mandatory checklist. Aplt. Br. at 24–25. Second, even if the checklist had been completed, the answer to at least one of the questions would be "yes," and therefore no discretion would exist from that point on about what kind of strategy to pursue. The Forest Service would have no choice but to pursue a suppression-oriented approach. Id. at 25–26. And third, even if the answers to the checklist had been such to allow discretion to use the fire for forest-management objectives, the ability to do that was still subject to a list of pre-determined areas and pre-approved conditions that were to be found in the Fire Management Plan. Id. at 11. But because the Forest Service had not updated its Fire Management Plan to specifically detail a list of such areas and conditions, no areas where the fire occurred could be used for forest-management objectives. Id.

Though the USFS disputes whether the Decision Checklist applied at the

time of the fire, for purposes of summary judgment the district court assumed that it did, and then concluded that the Checklist did not remove discretion from the USFS. Hardscrabble Ranch, 2015 WL 5307992, at *4. We agree. As to Hardscrabble Ranch's first point, the Checklist itself conferred discretion on the USFS decisionmakers. Indeed, this is evidenced by the discussion in the USFS's Incident Decision published on April 29. Though not specifically mentioning the Checklist, the "Rationale" section of the Decision considers just what the Checklist warrants: the threat to life, property, and public and firefighter safety; the acceptability of potential effects on natural resources; the degree of risk involved, and whether that risk was acceptable to the Forest Service; the degree to which fire-fighting resources might be taken up by other fire activity; and any other issues USFS personnel thought pertinent. Throughout, the language of the Decision evinces the strong discretionary nature of the assessment:

> The least exposure to fire fighters in managing this fire at this time is to implement suppression actions on the east and north flank and utilize State Hi[gh]way 96 as the control feature on [the] south flank. . . .

> Given the departure from historic conditions, the fuels reduction accomplished by the fire in terms of total volume reduced . . . will be beneficial. . . .

> Mitigation actions employed thus far through the construction of control lines on the north and east flanks are expected to keep the fire on NFS lands. . . .

> The risk of utilizing fire in the area is less than the potential long term risk of fire exclusion.

3 Aplt. App. 000275.

We quote from the Incident Decision not as a substitute for the Checklist, but to illustrate the various considerations necessary in answering the questions posed by the Checklist. Those considerations, and their weighing, are inherently discretionary. The Checklist simply did not remove USFS employees' choice or judgment regarding what measures to take; it did not "specifically prescribe[] a course of action for an employee to follow." Berkovitz, 486 U.S. at 536; see also Elder, 312 F.3d at 1178.

This would remain true even if the USFS abused its discretion in its determination of how to fight the fire. 28 U.S.C. § 2680(a). Thus, Hardscrabble Ranch's argument that a "yes" answer was warranted to one or more of the Checklist questions is unavailing; at most, this would be an abuse of discretion to answer the question "no." Yet that abuse is explicitly protected by the FTCA. Id.

As for Hardscrabble's third contention, that there simply was no area within the PSICC that could be used for forest-management goals, the LRMP specifically designated the Pike and San Isabel National Forests, as well as all USFS lands in the Wet Mountains, as "predetermined areas" for resource management objectives. Regarding the alleged pre-approved condition requirement, the EA does not specifically prescribe a course of action mandating the creation of these conditions, and USFS practice is that their mention simply means that a Forest Service unit can specify conditions in a fire plan but that it is

not required to do so.  See 6 Aplt. App. 000655.  In any event, since no document clearly mandates or specifies their creation, what those conditions are would themselves be matters of discretion for the USFS.  See Weiss v. United States, 787 F.2d 518, 523 (10th Cir. 1986) (explaining that "if a duty is not mandatory or not clearly specified then it is discretionary").

Finally, Hardscrabble Ranch also argues that the USFS failed to follow the mandatory directive to conduct daily monitoring of the fire in the Wildland Fire Decision Support System.  Aplt. Reply Br. at 5.  Though the USFS only released two Incident Decisions in that system — one on April 29 and one on April 30 — it is clear from those reports, from the change in tactics, and from the minute-by-minute incident log recorded in the WildCAD system, that the USFS was monitoring the fire sufficiently and in accordance with its discretion.  Again, the Checklist did not remove all discretion in how the USFS was to monitor the fire.

In sum, neither the Checklist nor other procedures identified by Hardscrabble explicitly told "the Forest Service to suppress the fire in a specific manner and within a specific period of time.  The existence of some mandatory language does not eliminate discretion when the broader goals sought to be achieved necessarily involve an element of discretion."  Miller v. United States, 163 F.3d 591, 595 (9th Cir. 1998).

B.    Policy Judgment

That the USFS had discretion in how to fight the fire is not the end of the

matter, for we must still consider whether that judgment is the kind the FTCA intended to shield. Berkovitz, 486 U.S. at 536. The FTCA protects decisions that "implicate[] the exercise of a policy judgment of a social, economic[,] or political nature." Duke v. Dep't of Agric., 131 F.3d 1407, 1411 (10th Cir. 1997). In other words, the discretionary action must be based on the purposes of the applicable regulatory regime. United States v. Gaubert, 499 U.S. 315, 325 n.7 (1991). Though not all discretionary acts fit this criteria, we presume that a government agent's discretionary actions are grounded in policy, and it is up to the challenger to allege facts showing that the actions were actually not policy-oriented. Id. at 324–25.

Hardscrabble Ranch contends that it has rebutted the Gaubert presumption by presenting evidence that the USFS did not use the Checklist, that the initial decision to not fully suppress the fire was made quickly after the fire's discovery, and that the formal publication of the decision-making did not appear until two days after that initial decision was actually made. Aplt. Br. 26–28. But none of this actually addresses the "focus of the inquiry," which "is not on the agent's subjective intent in exercising the discretion conferred by statute or regulation, but on the nature of the actions taken and on whether they are susceptible to policy analysis." Gaubert, 499 U.S. at 325; see also Kiehn v. United States, 984 F.2d 1100, 1105 (10th Cir. 1993).

The nature of the USFS actions in fighting the Sand Gulch Fire are

- 13 -

susceptible to a policy analysis grounded in social, economic, or political concerns. Cf. Green v. United States, 630 F.3d 1245, 1251 (9th Cir. 2011). Indeed, the balancing of the needs to protect private property, ensure firefighter safety, reduce fuel levels, and encourage natural ecological development — the very concerns raised by the Checklist and addressed by the USFS in its Incident Decision — are precisely the kind of social, economic, and political concerns the discretionary function exception was designed to shield from "judicial second guessing." Berkovitz, 486 U.S. at 536–37 (internal quotation marks and citation omitted).

AFFIRMED.