**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**January 30, 2020**

**Christopher M. Wolpert**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

JILLIAN ADE,

    Plaintiff - Appellant,

v.

CONKLIN CARS SALINA, LLC,

    Defendant - Appellee.

No. 19-3131
(D.C. No. 5:17-CV-04117-HLT)
(D. Kan.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **HARTZ**, **KELLY**, and **MATHESON**, Circuit Judges.
_____

Plaintiff-Appellant Jillian Ade appeals from the district court's grant of summary

judgment to Defendant-Appellee Conklin Cars Salina, LLC (Conklin) on her Title VII

and retaliatory discharge claims. Ms. Ade contends that Conklin — a car dealership —

terminated her employment of six months as a used car manager because of her sex and

in retaliation for her raising a compensation issue. On appeal, Ms. Ade argues that the

district court erred by finding that she failed to raise a genuine issue of material fact as to

whether (1) Conklin's stated reasons for firing her were pretextual or (2) she properly

invoked public policy protections against retaliatory discharge either under the Kansas

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of
the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive
value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

Wage Payment Act (KWPA) or as a whistleblower.  We have jurisdiction under 28 U.S.C. § 1291 and we affirm.

**Background**

Conklin hired Ms. Ade as a salesperson at its Salina store in 2005.  I Aplt. App. 34 ¶ 2; II Aplt. App. 4 ¶ 2.  In 2010, Ms. Ade took a new position at another Conklin dealership in Hutchinson, Kansas.  I Aplt. App. 34 ¶ 9; II Aplt. App. 5 ¶ 9.  She resigned that position in December 2016 due to a long commute.  I Aplt. App. 35 ¶ 17; II Aplt. App. 5 ¶ 17.  Shortly thereafter, she was rehired as the used car manager at Conklin Salina.  II Aplt. App. 10.  Ms. Ade's former manager at that location, Javier Lopez, recommended her for hire.  I Aplt. App. 36 ¶ 21; II Aplt. App. 6 ¶ 21.  She was terminated on June 12, 2017 by Conklin Salina's general manager, Gerard Smith.  I Aplt. App. 41 ¶ 52.

Shortly after returning to Conklin Salina, Ms. Ade became angry at an employee because she felt that the employee had not adequately washed a car before it was provided to a customer.  I Aplt. App. 36 ¶ 23; II Aplt. App. 6 ¶ 23.  She complained to the employee's manager, demanded that he discharge the employee, and threatened to discharge the employee herself when he refused despite lacking authority to do so.  I Aplt. App. 36–37 ¶¶ 24–25; II Aplt. App. 6 ¶¶ 24–25.  At a managers' meeting, Ms. Ade complained about the Conklin Finance Department being "old," "slow," and "slow as fuck."  I Aplt. App. 37 ¶ 26; II Aplt. App. 6 ¶ 26.  When a salesperson confronted Ms. Ade about alleged favoritism, she informed him that she could do "whatever the fuck"

2

she wanted and called the sales person a "cry baby" for bringing forward his concerns.  I Aplt. App. 37 ¶ 28; II Aplt. App. 6 ¶ 28.  Mr. Smith talked to Ms. Ade about her cursing and disruptive behavior on at least three occasions — the parties dispute whether these conversations constituted verbal reprimands.  I Aplt. App. 37 ¶ 30; II Aplt. App. 6 ¶ 30.

Conklin's compensation structure is relevant because Ms. Ade claims protections for airing problems with it.  Conklin pays salespersons a guaranteed monthly salary of $3,000 per month.  I Aplt. App. 37 ¶ 31; II Aplt. App. 6 ¶ 31.  Employees can receive more than $3,000 per month if the total of their commission and bonuses exceeds that amount.  I Aplt. App. 38 ¶ 32; II Aplt. App. 6 ¶ 32.  Conklin informed employees that the $3,000 guaranteed salary must be met by commission before any bonuses would be paid in excess and Ms. Ade understood this arrangement.  I Aplt. App. 38 ¶¶ 33–34; II Aplt. App. 6–7 ¶¶ 33–34.

On June 10, 2016, Ms. Ade emailed Mr. Smith while he was on vacation to complain about an employee accidentally selling the same car to two different customers and the way Conklin was administering a sales contest.  I Aplt. App. 39 ¶¶ 37, 39; II Aplt. App. 7 ¶¶ 37, 39.  In the email, Ms. Ade described Conklin as a "shit show" and a "clusterf*#%."  I Aplt. App. 39 ¶ 38; II Aplt. App. 7 ¶ 38.  Ms. Ade expressed dissatisfaction that Conklin was counting prize money from the sales contest against monthly guarantees, stating:

> There is no reason the contest payouts should [be] taken out of the salesperson guarantee.  If it's a bonus it's a bonus.  They should be paid the 1500 plus the bonus they won.  You do this to get them excited to sell and then turn around and not pay.  That is just wrong.

> I think the contest [sic] work for creating excitement but they won't anymore if this is how you are going to play it. So either do it right or don't do it at all.

I Aplt. App. 39 ¶ 38; II Aplt. App. 7 ¶ 39.

Mr. Smith informed Ms. Ade that they would discuss the matter when he returned from vacation and stated that "[i]f you[']re that unhappy maybe that is not for you[.]" I Aplt. App. 39 ¶ 40; II Aplt. App. 7 ¶ 40. Ms. Ade responded "[m]aybe. Its [sic] hard to work with lazy people." I Aplt. App. 39 ¶ 41; II Aplt. App. ¶ 41. Ms. Ade later posted "who is hiring[?]" on Facebook. I Aplt. App. 39 ¶ 42; II Aplt. App. 7 ¶ 42. At least two former and one current Conklin employees commented on the post. I Aplt. App. 39 ¶ 43; II Aplt. App. 7 ¶ 43. Mr. Smith did not see the post himself, but he did receive questions about it from several people who wondered what it meant for Ms. Ade's employment with Conklin. I Aplt. App. 40 ¶ 45; II Aplt. App. 7 ¶ 45.

On June 12, 2017, Mr. Smith returned to work and held a sales manager meeting with Ms. Ade and Mr. Lopez present. I Aplt. App. 40 ¶ 49; II Aplt. App. 8 ¶ 49. Ms. Ade left to retrieve her phone before the start of her shift. Id. When she returned, Mr. Smith and another manager called Ms. Ade into Mr. Smith's office and informed her that she was terminated. I Aplt. App. 41 ¶ 52; II Aplt. App. 8 ¶ 52. The stated reasons for termination were "Disruptive Behavior," "Conflict/Refusal to work with Co-Worker," and "Insubordination." I Aplt. App. 40 ¶ 47; II Aplt. App. 7 ¶ 40.

After termination, Ms. Ade reached out to Mr. Lopez to discuss her belief that another employee had orchestrated her firing. I Aplt. App. 41 ¶ 54; II Aplt. App. 8 ¶ 54. Ms. Ade and Mr. Lopez agreed that they had "made a good team while it lasted." Id.

4

Ms. Ade and her husband had attended a graduation party for Mr. Lopez's daughter at his invitation. I Aplt. App. 42 ¶ 66; II Aplt. App. 9 ¶ 66. Later, Ms. Ade began to believe that Mr. Lopez influenced Mr. Smith to terminate her because Mr. Lopez was jealous of her sales and generally dislikes women. I Aplt. App. 41 ¶ 56; II Aplt. App. 8 ¶ 56. Ms. Ade contends that another employee told her by text message that Mr. Smith held a second meeting with Mr. Lopez while she was retrieving her phone on the day of termination. I Aplt. App. 41 ¶ 57; II Aplt. App. 8 ¶ 57.

Before her termination, Ms. Ade observed two managers at Conklin Salina in a physical altercation in front of customers. II Aplt. App. 10 ¶ 6. She witnessed Mr. Lopez and other Conklin employees using profanity in the workplace, which she says was not an unusual occurrence. Id. at ¶ 7. She recounts that she heard Mr. Lopez make "vulgar and suggestive sexual comments" about women. Id. at ¶ 10. Conklin has settled two sexual harassment cases brought by former female employees against Mr. Lopez and required him to attend discrimination and harassment training. Id. at ¶ 11. These cases arose from a consensual sexual encounter that Mr. Lopez had with another Conklin employee and an incident where Mr. Lopez received nude photos of another employee. I Aplt. App. 16. After Ms. Ade's termination, Mr. Lopez took over her vacated position. II Aplt. App. 13 ¶ 20.

Ms. Ade contends that prior to termination she "had been making more sales than Mr. Lopez." Aplt. Br. at 5. Conklin tracks employee performance by both total profits and total units sold. I Aplt. App. 43, ¶¶ 67–70; II Aplt. App. 9 ¶¶ 67–70. During Ms. Ade's 2017 tenure at Conklin Salina, Mr. Lopez generated more total profits while Ms.

Ade sold more total units because Mr. Lopez made a greater profit per unit sold. I. Aplt. App. 43 ¶ 70; II Aplt. App. 9 ¶ 70. Mr. Smith expected the profits per unit to be approximately the same for sales made by employees in Mr. Lopez's and Ms. Ade's positions. I Aplt. App. 43 ¶ 71; II Aplt. App. 9 ¶ 71.

Conklin typically employs five sales managers and approximately fourteen sales representatives. II Aplt. App. 12 ¶ 12. At the time of Mr. Smith's deposition, two of the fourteen sales representatives at Conklin Salina were women. Of the 136 people employed at Conklin Salina during the relevant time period, approximately 26 — or 19.1% — were women. Id. at 14 ¶ 27.

**Discussion**

We review a district court's grant of summary judgment de novo, applying the same standard as the district court. Seifert v. Unified Gov't of Wyandotte Cty./Kan. City, 779 F.3d 1141, 1150 (10th Cir. 2015). Summary judgment should not be granted unless the moving party establishes that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We view the evidence in the light most favorable to the nonmoving party. Hardscrabble Ranch, LLC v. United States, 840 F.3d 1216, 1219 (10th Cir. 2016). The movant bears the burden of making an initial showing of the absence of a genuine issue of material fact. Teets v. Great-West Life & Annuity Ins. Co., 921 F.3d 1200, 1211 (10th Cir. 2019). If the movant meets this burden, the nonmovant must then set forth specific facts showing that there is a genuine issue for trial to avoid entry of summary judgment. Tesone v.

6

Empire Mktg. Strategies, 942 F.3d 979, 994 (10th Cir. 2019).  In diversity, this court applies the law of the state in which the district court sits.  Wade v. Emcasco Ins. Co., 483 F.3d 657, 665 (10th Cir. 2007).  Where the highest court of the forum state has not addressed an issue, we look to analogous decisions of that court, decisions of lower courts in that state, decisions of other federal and state courts, and the general weight and trend of authority to predict how the forum state's highest court would decide.  MidAmerica Constr. Mgmt., Inc. v. MasTec N. Am., Inc., 436 F.3d 1257, 1262 (10th Cir. 2006).

## A.  Title VII Claim

The district court properly granted summary judgment to Conklin.  Title VII prohibits discrimination in employment on the basis of sex, including by termination.  42 U.S.C. § 2000e-2(a).  The McDonnell-Douglas burden-shifting framework applies to cases like this, where there is no direct evidence of discrimination.  Thomas v. Berry Plastics Corp., 803 F.3d 510, 514 (10th Cir. 2015).  Once a plaintiff makes an initial prima facie showing of discrimination, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for termination.  EEOC v. PVNF, L.L.C., 487 F.3d 790, 800 (10th Cir. 2007).  A plaintiff may then demonstrate that the proffered reason is pretextual.  Id.

A plaintiff may show that a reason is pretextual by pointing out "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions," id. at 801, that would allow a rational factfinder "to conclude [the proffered reason is] unworthy of belief."  Hiatt v. Colo. Seminary, 858 F.3d 1307, 1316 (10th Cir. 2017).  The question "is not

7

whether the employer's proffered reasons were wise, fair, or correct, but whether it honestly believed those reasons and acted in good faith upon those beliefs." Hiatt, 858 F.3d at 1316 (quoting Swackhammer v. Sprint/United Mgmt. Co., 493 F.3d 1160, 1169–70 (10th Cir. 2007)). One path to showing a reason is pretextual is to demonstrate that the plaintiff "was treated differently from other similarly situated, nonprotected employees who violated work rules of comparable seriousness, provided the similarly situated employee shares the same supervisor, is subject to the same performance standards, and otherwise faces comparable relevant employment circumstances." EEOC v. BCI Coca-Cola Bottling Co., 450 F.3d 476, 489 (10th Cir. 2006) (quoting Green v. New Mexico, 420 F.3d 1189, 1194 (10th Cir. 2005)). Where an employee was hired and discharged by the same person within a relatively short time span, "there is a strong inference that the employer's stated reason for acting against the employee is not pretextual." Antonio v. Sygma Network, Inc., 458 F.3d 1177, 1183 (10th Cir. 2006) (quoting Proud v. Stone, 945 F.2d 796, 798 (4th Cir. 1991)). This is referred to as the "same actor" inference. Id.

Conklin concedes that Ms. Ade can demonstrate a prima facie case of discrimination. II Aplt. App. 185. Conklin can rebut the prima facie case by offering legitimate, nondiscriminatory reasons for her termination. Conklin maintains that it discharged Ms. Ade for "Disruptive Behavior," "Conflict/Refusal to work with Co-Worker," and "Insubordination" based on the incidents described above. I Aplt. App. 40 ¶ 47; II Aplt. App. 7 ¶ 40. Ms. Ade then bore the burden of showing that these reasons

8

were pretextual. Because Mr. Smith hired and discharged Ms. Ade within an approximately six-month period, the same actor inference applies here.

The district court correctly concluded that Ms. Ade failed to carry her burden. Ms. Ade argues that "Conklin subjected [her] to a more strenuous disciplinary standard than her similarly-situated male co-workers." Aplt. Br. at 16. First, Ms. Ade contends that swearing was commonplace at Conklin locations and that she was selectively singled out for punishment. Id. But the record also showed that Ms. Ade swore more than most employees and that Mr. Smith had to speak with her about this behavior on at least three occasions. I Aplt. App. 37 ¶ 30; II Aplt. App. 6 ¶ 30. Ms. Ade argues that "male co-workers were punished on a multiple-strike basis and received multiple reprimands or write-ups without being terminated." Aplt. Br. at 16. However, the portion of the record she cites does not support this allegation. Ms. Ade has shown no evidence that similarly-situated male coworkers swore at the same frequency without incurring discipline. The other incident Ms. Ade cites — involving a confrontation between two male employees — does not aid her case because she was not able to say whether either of the employees was disciplined. II Aplt. App. 11–12, 22.

Ms. Ade next contrasts Conklin's treatment of her with its treatment of Mr. Lopez. According to Ms. Ade, the fact that Mr. Lopez was not discharged after two incidents of sexual harassment demonstrates that Conklin's reason for terminating her was pretextual. But Ms. Ade cannot establish, based on the facts in the summary judgment record, that Mr. Lopez was similarly situated with respect to the offense committed, his supervisor at the time, and other relevant employment circumstances. BCI Coca-Cola, 450 F.3d at

9

489. As the district court observed, the record does not even disclose when the incidents took place or who Mr. Lopez's supervisor was at the time.[1]  II Aplt. App. 208.

Ms. Ade also advances a pretext theory that Mr. Lopez's alleged animus toward women caused her termination, even though he was not her supervisor.  Aplt. Br. at 19. To support this, Ms. Ade again points to Mr. Lopez's disciplinary history and his comments about women.  However, a critical link between Mr. Lopez's alleged animus and Ms. Ade's firing relies on a text message from another coworker claiming that Mr. Smith held a meeting with Mr. Lopez while Ms. Ade was retrieving her phone on the day of her termination.  See Aplt. Br. at 19; I Aplt. App. 41 ¶ 57; II Aplt. App. 8 ¶ 57.

The district court correctly concluded that this text message was inadmissible hearsay.  The text message claimed that Mr. Smith met with Mr. Lopez the day of Ms. Ade's termination.  Aplt. Br. at 19.  Ms. Ade offered the text message to prove that fact, which might lead one to infer that something Mr. Lopez said in that meeting caused Mr. Smith to terminate her.  The text message was an out-of-court statement offered to prove the truth of the matter asserted and was correctly excluded as inadmissible hearsay under Federal Rule of Evidence 802.  Even if that message had been admissible, Ms. Ade was not able to offer any specifics about the content of the alleged meeting to support an inference that Mr. Lopez took some action to cause Mr. Smith to discharge her later that

---

[1] At oral argument, Ms. Ade claimed that Mr. Lopez was also supervised by Mr. Smith during the periods he was disciplined.  We are unable to find any support for this assertion in the summary judgment record.

10

morning. Ms. Ade has failed to raise a triable issue of fact as to whether Mr. Lopez's "actions caused the adverse employment action." BCI Coca-Cola, 450 F.3d at 487.

Ms. Ade has failed to demonstrate a genuine issue of material fact concerning whether Conklin's proffered reasons for her termination were pretextual. In particular, she failed to present "countervailing evidence" to "dispel" the same actor inference that is applicable to her case. Antonio, 458 F.3d at 1184. On this record, no rational factfinder could conclude that Conklin's proffered reasons were "unworthy of belief." Hiatt, 858 F.3d at 1316.

## B. Retaliatory Discharge

Ms. Ade advances two theories of retaliatory discharge in violation of public policy: (1) violation of her rights under the KWPA, and (2) violation of whistleblower protections. The district court correctly granted Conklin summary judgment on both theories.

Kansas is an at-will employment state, meaning that employers can discharge employees at any time for any reason. Campbell v. Husky Hogs, L.L.C., 255 P.3d 1, 3–4 (Kan. 2011). There are exceptions to this rule for retaliatory discharges that violate public policy by undermining important state interests. Id. at 5. As relevant here, public policy forbids firings in retaliation for the exercise of rights under the KWPA and for whistleblowing. Id. at 4, 7.

In order to invoke the protections of the KWPA, an employee must either file a claim under the act or raise a complaint that "is clear enough that the employer would understand that the employee is asserting rights protected by the [KWPA]." Deeds v.

11

<u>Waddell & Reed Inv. Mgmt. Co.</u>, 280 P.3d 786, 792 (Kan. Ct. App. 2012). The complaint must not be so "equivocal" that it would fail "to place a reasonable employer on notice that [the plaintiff] was making some claim under the [KWPA] or . . . intended to do so." <u>Id.</u> at 793.

Kansas law recognizes a separate protection for employees who blow the whistle on violations of certain laws and regulations. Whistleblower protections are triggered where "a reasonably prudent person would have concluded the employee's co-worker or employer was engaged in activities in violation of rules, regulations, or the law pertaining to public health, safety, and the general welfare." <u>Palmer v. Brown</u>, 752 P.2d 685, 690 (Kan. 1988). The employer must be aware of the reporting and terminate the employee in retaliation. <u>Id.</u> Reporting must be done in good faith, not for a corrupt motive. <u>Id.</u>

Both retaliatory discharge claims arise from Ms. Ade's email communication to Mr. Smith about the sales contest. Ms. Ade did not file a formal claim under the KWPA, so she must show that this communication put Conklin on notice that she was asserting rights under that statute. Even in the light most favorable to Ms. Ade, this email simply does not put the employer on reasonable notice. The message conveys only that Ms. Ade disagreed with the way the contest was structured, not that she believed it violated the employee's legal rights.

Ms. Ade also asserts that she should qualify for whistleblower protections under <u>Palmer</u>. <u>See</u> Aplt. Br. at 33–35. Whistleblower protections do not require a clear statement of invocation. <u>Palmer</u>, 752 P.2d at 689–90. Instead, Ms. Ade must show that that she reasonably and in good faith reported violations of a law pertaining to public

health, safety, and the general welfare, that Conklin was aware of her report, and that Conklin discharged her in retaliation.  Id.  In effect, Ms. Ade argues that Kansas law recognizes two types of public policy discharge protections for reporting violations of the KWPA: one directly under Campbell and the other under the umbrella of Palmer whistleblower protections because, she argues, the KWPA should be understood as a law pertaining to public health, safety, and the general welfare.

The district court correctly concluded that Kansas law does not support the argument for overlapping public policy protections.  Ms. Ade cites no authority for the proposition that Kansas courts understand the KWPA to be a law that pertains to public health, safety, and the general welfare within the meaning of Palmer.  The fact that Deeds and other cases carve out a specific public policy protection for the KWPA suggests that it is not included in the Palmer framework.  The Campbell case includes Palmer as one of the "four circumstances" where the court has endorsed public policy exceptions to the at-will doctrine before going on to carve out a fifth exception for the KWPA specifically.  Campbell, 255 P.3d at 4.  Ms. Ade does not persuasively square Deeds and Campbell with her formulation, which would give employees who make good faith complaints about violations of the KWPA two bites at the retaliatory discharge apple with different standards applying each time.

Even if Ms. Ade's understanding of KWPA and whistleblower protections is correct, she cannot show that a reasonably prudent person in her position would have concluded that Conklin's contest violated the KWPA.  Ms. Ade understood Conklin's compensation structure, which required an employee to meet the guaranteed salary

13

amount before any bonuses would be paid. I Aplt. App. 38 ¶¶ 33–34; II Aplt. App. 6–7 ¶¶ 33–34. She believed that "the terms of this special contest required Conklin [] to pay the bonuses on top of their guarantees and that Conklin [] failed to properly compensate its salespersons under this special bonus program." II Aplt. App. 13 ¶ 25. Ms. Ade asserts that "this contest was apparently unlike the ordinary bonus structure because Mr. Smith did not remember how this specific contest was compensated." Aplt. Br. at 35. It is not reasonable to infer (1) that this contest differed from other contests held by the dealership (2) in the material way Ms. Ade alleged simply because Mr. Smith could not remember its terms. When directly asked whether it was his "understanding that if a salesperson won the contest or received a payout it would count against their guarantee," Mr. Smith responded: "Everything goes to the guarantee before you pay it." II Aplt. App. 104:5–9. This evidence fails to raise a triable issue of fact as to whether a reasonable prudent person would have concluded that Conklin's contest violated the KPWA.

**AFFIRMED**.

Entered for the Court

Paul J. Kelly, Jr.
Circuit Judge

14