**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 30, 2024**

**Christopher M. Wolpert**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

STRAWBERRY WATER USERS
ASSOCIATION,

    Plaintiff - Appellant,

v.

    No. 23-4068

UNITED STATES OF AMERICA,

    Defendant - Appellee.

_____

**Appeal from the United States District Court**
**for the District of Utah**
**(D.C. No. 2:22-CV-00002-JNP)**

_____

Quentin M. Rhoades, Rhoades & Erickson PLLC, Missoula, Montana for Plaintiff-Appellant Strawberry Water Users Association.

Amanda A. Berndt and Nathan Jack (joined by Trina A. Higgins on the brief), United States Attorney for the District of Utah, Salt Lake City, Utah for Defendant-Appellee United States of America.

_____

Before **HARTZ**, **BACHARACH**, and **ROSSMAN**, Circuit Judges.

_____

**HARTZ**, Circuit Judge.

_____

The issue on appeal is whether the discretionary-function exception to liability under the Federal Tort Claims Act (FTCA) applies to the United States Forest Service's alleged mismanagement of two wildfires ignited on public lands. The

district court held that the exception applied and therefore it was stripped of jurisdiction to hear the claims. *See Strawberry Water Users Ass'n v. United States*, No. 2:22-cv-00002-JNP-DAO, 2023 WL 2634333, at *1 (D. Utah Mar. 24, 2023). Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

The underlying facts are uncontested. The accounts that follow are taken from the complaint, a government affidavit, and official documents. In late summer 2018 lightning struck remote areas of national forests in Utah, igniting the Bald Mountain and Pole Creek Fires. Believing the small fires could benefit the forest environment, the Forest Service decided to monitor and contain the fires rather than suppress them. But unpredicted high winds fueled the fires' expansion. Although the Forest Service soon evolved its strategy from containment to full suppression, the wildfires burned approximately 100,000 acres of public and private lands for over a month. Seeking damages for the wildfires' destruction of property of its members, Plaintiff Strawberry Water Users Association sued the United States under the FTCA, alleging mismanagement of the wildfires.

## I.    REGULATORY BACKGROUND

The 193 million acres of the National Forest System are divided into units (Forest units) managed by Forest Supervisors. The 1976 National Forest Management Act (NFMA) requires the Forest Service to develop, review, and update Land and Resource Management Plans (Forest Plans) for each unit. *See* 16 U.S.C. §§ 1600(2)–(6), 1604, 1609; Aplt. App., Vol. II at A352. The Forest Plans provide guidance for

land-and-resource-management activities within each Forest unit, including setting forth fire-management objectives.

In 2003 Forest Supervisors approved revised Forest Plans for the Uinta and Wasatch-Cache National Forests, which were redesignated as a single Forest unit, the Uinta-Wasatch-Cache (UWC) National Forest, in 2007. The Forest Plans were developed and approved in compliance with the National Environmental Policy Act (NEPA), which requires federal agencies to consider environmental consequences before taking certain agency actions. *See* 42 U.S.C. § 4332(2)(c). The NFMA requires the Forest Service to monitor conditions within each Forest unit to determine when amendments and revisions to the Forest Plan are needed. *See* 16 U.S.C. § 1604(f)–(g). In compliance with that requirement, leadership for the UWC National Forest determined in 2017 that no amendment to the 2003 Plan was required, and no amendments have been made since.

At the time of the Bald Mountain and Pole Creek wildfires, the UWC National Forest Plan contained the following guideline for determining when a natural fire in a designated wilderness area should be allowed to burn:

> Guideline: Wildland fire use is allowed to reduce unnatural fuel accumulations and restore fire to its natural role when the following conditions exist:
>
> a.  Reduction of available fuels and other conditions will promote attainment of a healthy wilderness ecosystem.
>
> b.  Fire location does not constitute an unacceptable risk to resources or property outside the wilderness area.

Aplt. App., Vol. II at A358. For areas not designated as wilderness, the Plan

provided:

> Wildland fire use is authorized forest-wide, except in high-use travel corridors, where there are susceptible known cultural resources, and where direction for certain management areas and management prescriptions provides otherwise. The appropriate response is suppression in high-use travel corridors or where there are susceptible known cultural resources. In areas authorized for wildland fire use, the full range of appropriate management responses, from full suppression to monitoring, may be used.

*Id.* at A359. The Plan thus permits the Forest Service to use rather than suppress

wildfire under certain conditions. Nothing in the Plan mandates the immediate

suppression of wildfires. Instead, the Plan "allowed the fire managers discretion to

evaluate the potential risks and benefits associated with naturally caused wildfires in

this area and to devise plans that presented the best chance of protecting values while

also reducing future risk from wildfires by reducing fuels and restoring resilience to

wildfire." *Id.* According to UWC resource managers, "The Forest embraces

opportunities to allow unplanned fires to reduce fuel accumulations and contribute to

landscape sustainability where and when conditions are right to do so with little

risk." *Id.*, Vol. III at A613. By contrast, "[h]uman-caused fires . . . are unwanted

wildland fires, and will be suppressed." *Id.*, Vol. II at A581; *id.*, Vol. III at A604.

Forest Plan guidelines also require the Forest Service to produce annually a

"Default Initial Fire Response Map," referred to as the "Red/Green Map," which

depicts areas within the UWC National Forest and communicates to the public the

"areas in which fire starts might be considered as a means to meet Forest Plan

objectives." *Id.* at A613. Permissible reasons for the use of fire include "reduc[ing] fuel accumulations and contribut[ing] to landscape sustainability where and when conditions are right to do so with little risk." *Id*. The maps can be revised in response to "meetings with neighbors and partners" where objectives are "shared" and "discussed." *Id*. An area marked in red indicates "where fire is unwanted due to adjacent values" and is labeled "Suppression Likely." An area marked in green "might be evaluated for an approach that would lead to a larger fire footprint," and is labeled as a "Fire Management Opportunity Area." *Id*.

The Forest Service's authority to manage wildfires is also governed by another statutory regime. The Federal Land Assistance, Management, and Enhancement Act of 2009 (the FLAME Act) directs the Secretary of Agriculture and Secretary of the Interior to develop jointly a national strategy for wildfire management. *See* 43 U.S.C. § 1748b(a). Under this mandate the Secretaries produced the National Cohesive Wildland Fire Management Strategy (the National Strategy) in 2014. The National Strategy declares a vision to "safely and effectively extinguish fires when needed; use fire where allowable; manage our national resources; and as a nation, to live with wildland fire." United States Department of Agriculture, *The National Strategy: The Final Phase in the Development of the National Cohesive Wildland Fire Management Strategy* [https://perma.cc/LEJ9-WSNQ].

In 2015 the Forest Service adopted the USDA Forest Service Strategic Plan: FY 2015-2020 (the National Plan), a five-year plan to carry out the National Strategy. It states in part:

Our priority is to reduce the risk from wildfire to communities and natural resources. When fuels build up, especially in the wildland-urban interface—heavy vegetation, for example, or tangles of fallen trees and branches—the risk of a wildfire rises. We will work with partners to evaluate the risk and reduce it by removing the most hazardous fuels. We will also focus on reducing the number of human-caused wildfires by helping people learn ways to prevent them. By applying the best available science and land management and by working closely with landowners and other partners, we will restore the natural role of fire while helping at-risk communities adapt to wildfire hazards.

United States Department of Agriculture, *USDA Forest Service Strategic Plan: FY 2015-2020*, at 12 [https://perma.cc/4VLN-DS2Z]. The Plan's fire-management strategy has three main components: "(1) restoring fire-adapted ecosystems, (2) helping communities become safer when threatened by wildfire, and (3) responding appropriately to wildfire." *Id*.

## II.    THE FIRES

On August 24, 2018, lightning ignited the Bald Mountain Fire in a remote wilderness area within the UWC National Forest. The parties agree that the point of origin was within a "green area" on the 2018 Red/Green Map, where a natural fire could be used for beneficial resource purposes. After considering factors including firefighter safety, composition of surrounding vegetation, the remote location of the fire, weather conditions, and the potential use of the fire to meet resource management objectives, the Forest Service published an Incident Decision on August 27, 2018.

According to the Incident Decision, managers planned to monitor the Bald Mountain Fire and allow it to burn into unpopulated areas to "reduce unnatural fuel

accumulations and restore fire to its natural role," noting that "[r]eduction of available fuels and other conditions will promote attainment of a healthy wilderness ecosystem." Aplt. App., Vol. II at A579. In particular, the Forest Service sought to minimize safety risks to firefighters and decided that the "rugged terrain and limited access" rendered containment "our best option at this time." *Id.* at A574, A589. The Forest Service's decision was also based on the assessment that "[f]ire season and weather patterns indicate[d] favorable conditions for this incident to achieve resource benefits." *Id.* at A573. Indeed, fire managers believed "the fire would go out on its own at a small size due to the wetness of recent storms . . . like other recent fires [i]n the Forest." *Id.*, Vol. III at A615. In addition, the Incident Decision considered private-property interests, stating that the "[f]ire location does not constitute an unacceptable risk to resources or property outside the wilderness area." *Id.*, Vol. II at A579. Nevertheless, fire managers would "consider and allow suppression actions on the southwest and southern boundaries to prevent fire from reaching private lands." *Id.*, Vol. III at A616. Firefighters continued to monitor the fire and observed little growth. On September 5 the Bald Mountain Fire was only 5.5 acres in size.

About six miles southeast of the Bald Mountain Fire, lightning struck another remote area of the UWC National Forest, igniting the Pole Creek Fire on September 6, 2018. This fire began in a nonwilderness area. Like the Bald Mountain Fire, the Pole Creek Fire's origin was within a "green area" on the 2018 Red/Green Map, indicating that it could also be used for resource benefits.

On September 7 the Forest Service published an Incident Decision for the Pole Creek Fire. The Forest Service developed a "confine and contain strategy to minimize risk to firefighters while allowing fire to reduce fuels and enhance wildlife habitat." *Id.* at A603. The strategy included burnout operations, aerial application of fire retardant, and the construction of fire-containment lines. The Forest Service anticipated a "[l]ow probability for a significant event or extreme fire conditions." *Id.* at A597, A607; *see also id.* at A617 (according to Forest leadership, "[t]he risk versus values, location, time of year, all indicated that this is a fire that we should not engage" (internal quotation marks omitted)). Leadership would reassess the strategy if the fire grew beyond the remote area because "[r]esource benefits fires should not impact public use or public access." *Id.*

Although the Pole Creek Fire initially stayed small, fire crews on September 7 "began line prep and scouting in case they needed to take action to contain the fire to [a] predefined 210-acre box." *Id.* at A618. On September 9 the fire smoldered at 0.5 acres in size. Believing the conditions were "too wet for the fire to spread," the Forest Service continued to attempt to use the wildfire to achieve resource goals by "burn[ing] small jackpots of fuel" down a ridge to the main fire. *Id.* at A619.

On September 10 the National Weather Service issued a Red Flag Warning for high winds in the area, "earlier than the firefighters expected." *Id.* at A620. The winds rapidly escalated the growth of the fires over the next few days. Fire managers' strategy evolved from "confine and contain" to "full suppression," and individuals threatened by the spread of fire were to be evacuated. *Id.* at A603, A626

(internal quotation marks omitted). Fire managers implemented a wide variety of control tactics, including the use of aircraft and bulldozers, and the establishment of new containment lines. On September 13 the Forest Service announced its intent to "[u]tilize direct and indirect tactics to fully suppress the fire. This action will take into account: first, risk and exposure to firefighters and the public; and second, the protection of identified values such as utility corridors and infrastructure, private structures, the railroad corridor, and the Highway 6 corridor." *Id.* at A629. In October 2018 the fires were finally brought under control. Yet the wildfires left nearly 100,000 acres of public and private land burned in their wake. "This explosion of fire activity was driven by winds that, according to the Public Information Officer attached to the incident, 'were almost unnatural.'" *Strawberry Water Users*, 2023 WL 2634333, at *5.

## III.    ANALYSIS

The Federal Tort Claims Act (FTCA) offers a limited waiver of sovereign immunity for certain types of tort lawsuits against the United States. The United States can be held liable only "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). The Supreme Court long ago held that the United States Forest Service's negligent management of a forest fire comes within the scope of the FTCA. *See Rayonier Inc. v. United States*, 352 U.S. 315 (1957).

An oft-litigated statutory exception to the FTCA, invoked here by the government, is the discretionary-function exception. This exception shields the United States from liability for acts or omissions "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). When the exception applies, the district court lacks jurisdiction over the claim. *See Knezovich v. United States*, 82 F.4th 931, 936–37 (10th Cir. 2023). "The basis for the discretionary function exception was Congress' desire to prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *Berkovitz v. United States*, 486 U.S. 531, 536–37 (1988) (internal quotation marks omitted). The exception "marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals." *United States v. Varig Airlines*, 467 U.S. 797, 808 (1984).

The Supreme Court established a two-part test to determine when the exception applies. First, the challenged conduct must be "a matter of choice for the acting employee." *Berkovitz*, 486 U.S at 536. In particular, this part of the test is not satisfied if the Forest Service's decision "violated a federal statute, regulation, or policy that is both specific and mandatory." *Elder v. United States*, 312 F.3d 1172, 1177 (10th Cir. 2002) (internal quotation marks omitted); *see Berkovitz*, 486 U.S at 536 (the discretionary-function exception "will not apply when a federal statute,

Page 10

regulation, or policy specifically prescribes a course of action for an employee to follow"). Second, the challenged decision must be "based on considerations of public policy," *Elder* 312 F3d at 1176 (internal quotation marks omitted)—that is, the decision must be "grounded in social, economic, or political concerns." *Hardscrabble Ranch, L.L.C. v. United States*, 840 F.3d 1216, 1222 (10th Cir. 2016). This standard is an objective one; it looks to "the nature of the actions taken and . . . whether they are susceptible to policy analysis," not "the agent's subjective intent in exercising the discretion conferred." *United States v. Gaubert*, 499 U.S. 315, 325 (1991).

We review the application of the discretionary-function exception de novo. *See Ball v. United States*, 967 F.3d 1072, 1077 (10th Cir. 2020). We begin with the second part of the test. Our precedents clearly establish that the conduct in this case falls within that part of the exception. In both *Knezovich*, 82 F.4th at 934–35, and *Hardscrabble Ranch, L.L.C.*, 840 F.3d at 1217, this court dealt with the same question as here—namely, whether the Forest Service could be liable for mismanaging wildfires that spread from public to private lands. In those cases, like the one before us, private landowners sued the United States under the FTCA for mismanagement of wildfires that began on public land and damaged their property. *See Knezovich*, 82 F.4th at 934–35; *Hardscrabble Ranch*, 840 F.3d at 1217–18. In each case the Forest Service issued an Incident Decision that balanced several competing public-policy interests, including firefighter safety, risk to private property, and potential resource benefits; yet despite Forest Service efforts, the wildfires resulted in the destruction of plaintiffs' private property. *See Knezovich*, 82

Page 11

F.4th at 934–35; *Hardscrabble Ranch*, 840 F.3d at 1217–18. In that circumstance we have said that because "[f]ire management *necessarily* involves balancing practical considerations of funding and safety as well as concerns of a fire's impact on wildlife, vegetation, and human life," such decisions amount to policy judgments. *Knezovich*, 82 F.4th at 942–43 (internal quotation marks omitted and emphasis added).

It would be hard to disagree with this analysis, and SWUA does not try. Its briefs do not address the second prong of the discretionary-function exception. But it raises other challenges to the application of the discretionary-function exception in this case.

SWUA first contends that the Supreme Court has already foreclosed the government's invocation of the exception. It asserts that the Supreme Court's decision in *Rayonier*, 352 U.S. at 318, settled the matter by stating that the discretionary-function exception does not apply "to negligence claims against wildland firefighters." Aplt. Br. at 30. The assertion is not wholly frivolous. In *Rayonier* the Court reversed the dismissal of a claim under the FTCA for negligent management of a forest fire that ultimately destroyed private property. *See Rayonier*, 352 U.S. at 315–17. The focus, and sole holding, of the opinion was to reject the position of the lower courts that making the government liable for negligent handling of a fire would impose "novel and unprecedented liabilities" that were not to be covered by the FTCA, even though a private party in the same circumstances would have been liable. *Id.* at 317 (internal quotation marks omitted). But in the course of

Page 12

its analysis the Court said the following: "The Tort Claims Act makes the United States liable (*with certain exceptions which are not relevant here*) for the negligence of its employees in the same manner and to the same extent as a private individual under like circumstances." *Id.* at 318 (ellipsis and internal quotation marks omitted; emphasis added). The emphasized language, which was not accompanied by any analysis or explanation, could be read to suggest that the discretionary-function exception could have no application to the case. But as the Eleventh Circuit recently pointed out, *Rayonier* was decided nearly three decades before "the Supreme Court began to synthesize its prior precedent and to articulate the two-part test [for application of the discretionary-function exception] that federal courts apply today." *Foster Logging, Inc. v. United States*, 973 F.3d 1152, 1161 (11th Cir. 2020). This court has similarly been unwilling to take the emphasized language at face value. As we previously observed in *Knezovich*, "[*Rayonier*] did not concern the discretionary function exception and does not control here." 82 F.4th at 943 n.6; *see also Foster Logging*, 973 F.3d at 1161 ("The Supreme Court's decision in *Rayonier* addresses the scope of the FTCA's waiver, not the discretionary-function exception to that waiver."); *Miller v. United States*, 163 F.3d 591, 596 (9th Cir. 1998) ("*Rayonier* is not a discretionary function exception case."). *Rayonier* thus has no applicability to the present-day discretionary-function-exception analysis.

SWUA next argues that the first prong of the *Berkovitz* test is not satisfied— that is, that the Forest Service lacked discretion to act as it did here. In SWUA's

view, the Forest Service cannot meet the first prong of *Berkovitz* since it lacked the power to act in the first instance. Its arguments in support of this idea are unavailing.

SWUA begins by arguing that "the Forest Service has no statutory authority, discretion, or delegated power to impose on its neighbors its vision for 'restoring fire' to the [non-UWC] landscape." Aplt. Br at 50. It relies heavily on a declaration by its expert, Franklin Carroll, a retired Forest Service policy analyst, to support the contention that "the Forest Service implemented a national strategy of purposefully using anticipated natural wildfire to immolate private and nonfederal public lands and communities, forcing upon them its vision for people beyond its boundaries to live with wildland fire." Aplt. Br. at 9–10 (internal quotation marks omitted). SWUA cites out-of-circuit decisions holding that when an agency acts without authority, the discretionary-function exception does not apply because the agency does not have discretion to commit such an act. *See Red Lake Band of Chippewa Indians v. United States*, 800 F.2d 1187, 1197 (D.C. Cir. 1986) ("Since [the FBI agent] did not have authority to take charge of the non-FBI law enforcement personnel on the reservation, and since he did so in a departure from an established FBI policy against engaging in policing activity on reservations, his actions in taking charge and ordering the withdrawal are not shielded from liability under the discretionary function exception."); *Birnbaum v. United States*, 588 F.2d 319, 329 (2d Cir. 1978) ("A discretionary function can derive only from properly delegated authority. Authority generally stems from a statute or regulation, or at least, from a jurisdictional grant that brings the discretionary function within the competence of

the agency. . . . An act that is clearly outside the authority delegated cannot be considered as an 'abuse of discretion.'").

Here, however, the Forest Service undoubtedly acted within the ambit of its authority in allowing the fires to burn. Congress granted the Forest Service the authority to develop and implement wildfire-management policies under dual statutory regimes. The National Forest Management Act expressly requires the Forest Service to develop and maintain Forest Plans that permit the limited use of wildfires to "reduce unnatural fuel accumulations and restore fire to its natural role." Aplt. App., Vol. II at A358. And under the Federal Land Assistance, Management, and Enhancement Act, Congress required the Secretaries of Agriculture and the Interior to develop a national strategy for wildfire management on federal land, which provides for "employing the appropriate management response to wildfires." 43 U.S.C. § 1748b(b)(3). This strategy invests the Forest Service with the authority to "safely and effectively extinguish fire when needed; use fire where allowable; manage our national resources; and as a nation, to live with wildland fire." United States Department of Agriculture, *The National Strategy: The Final Phase in the Development of the National Cohesive Wildland Fire Management Strategy* [https://perma.cc/LEJ9-WSNQ]. The Forest Service did not act beyond the limits of that authority in managing the Bald Mountain and Pole Creek Fires, both of which originated on Forest Service lands. The mere fact that the fire spread from public to private lands does not prove that the Forest Service "purposefully" intended to "immolate" private property. Aplt. Br. at 9. No Forest Service plan, strategy, or

Page 15

policy statement supports that notion. Although expert-witness Carroll pointed to the Red/Green Map as evidence of such an intention, *see* Aplt. Br. at 11, the Map merely identifies areas *within* the UWC National Forest where fire starts might be used to meet resource-management objectives. We agree with the district court that "there is no evidence to indicate that the Forest Service intended to burn land outside the UWC National Forest." *Strawberry Water Users*, 2023 WL 2634333, at *7.

SWUA's last resort is to argue that the Forest Service acted without authority by adopting the Red/Green Map without conducting a mandatory environmental analysis under NEPA. NEPA requires federal agencies to prepare an environmental impact statement (EIS) before taking major federal action. 42 U.S.C. § 4332(2)(c). In SWUA's view, NEPA prescribes a mandatory process that the Forest Service failed to undertake, thereby stripping the agency of its discretion to promulgate the Map.

But we need not address whether an EIS was required before adopting the Map. If the Forest Service cannot exercise its discretion concerning a fire unless it has a properly adopted Red/Green Map and it cannot adopt a map without preparing an EIS, it follows that the Forest Service could take no action to deal with the Bald Mountain or Pole Creek wildfires. SWUA seems to assume that without the Map the Forest Service had no choice but to extinguish all fires. But it fails to explain how it can make that assumption. The relevant statutes, National Strategy, and Forest Plans do not declare that extinguishing fires is the default action. Thus, the natural consequence of the Forest Service's having no discretion in how to deal with the fires

would be that it could not exercise its discretion to extinguish the fires. This absurd result could afford SWUA no relief.

In any event, SWUA's NEPA argument is based on a false premise. The Red/Green Map does not restrict Forest Service discretion in the sense required by the first *Berkovitz* prong. That prong asks whether the challenged decision "violated a federal statute, regulation, or policy that is both specific and mandatory." *Elder*, 312 F.3d at 1777 (internal quotation marks omitted). In the wildfire-management context, we ask whether a mandatory directive requires the Forest Service to "suppress the fire in a specific manner and within a specific period of time." *Hardscrabble Ranch*, 840 F.3d at 1222. But if the Forest Service ultimately retains discretion in "how to respond to the fire" or in "how to fight the fire," the discretionary-function exception applies. *Knezovich*, 82 F.4th at 938 (citing *Hardscrabble Ranch*, 840 F.3d at 1220–21) (brackets and internal quotation marks omitted). And the Forest Service retains such discretion even after issuance of a Red/Green Map. The Forest Service's authority in responding to wildfires does not come from the Map, but from the FLAME Act and the NFMA. Those statutes grant the Forest Service the clear discretion to manage wildfires that arise on its lands. The Red/Green Map merely functions as a means to communicate to the public "areas in which fire starts might be considered as a means to meet Forest Plan objectives." Aplt. App., Vol. III at A613. It is far from "specific and mandatory." Whether or not the Red/Green Map was properly promulgated, the Forest Service still had the discretion necessary for application of the discretionary-function exception.

Moreover, even if a NEPA EIS were mandatory, NEPA itself does not limit the actions the Forest Service may take with respect to wildfire management. *See Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 558 (1978) (the mandate of NEPA is "essentially procedural"; it does not require particular substantive results); *cf. Hardscrabble Ranch*, 840 F.3d at 1222 ("The existence of some mandatory language does not eliminate discretion when the *broader goals sought to be achieved necessarily involve an element of discretion.*" (internal quotation marks omitted and emphasis added)). NEPA does not, as is required by the first prong of the discretionary-function exception, "specifically prescribe[] a course of action for an employee to follow." *Berkovitz*, 486 U.S. at 536. The relevant course of action here is fighting a fire. And NEPA does not require the Forest Service to "suppress the fire in a specific manner and within a specific period of time." *Hardscrabble Ranch*, 840 F.3d at 1222. It therefore cannot form the basis for concluding that the agency failed to follow a mandatory course of action. *See id.*

Finally, because NEPA "creates no private right of action," *New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 719 (10th Cir. 2009), any allegation that SWUA failed to comply with NEPA must be resolved in the first instance via the Administrative Procedure Act, not the FTCA.

Thus, as in *Knezovich* and *Hardscrabble Ranch*, both prongs of the *Berkovitz* test are satisfied here. The discretionary-function exception applies to the Forest Service's fire-management decisions in this case.

## IV.    CONCLUSION

We **AFFIRM** the district court's dismissal for lack of jurisdiction.