**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 31, 2020**

**Christopher M. Wolpert**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

LOGAN BALL; ELIZABETH BALL;
ESTATE OF SARAH BALL,

     Plaintiffs - Appellants,

v.

UNITED STATES OF AMERICA,

     Defendant - Appellee.

No. 19-1161

_____

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 1:18-CV-01461-REB-NRN)**
_____

Randall M. Weiner, Law Offices of Randall M. Weiner, P.C., Boulder, Colorado (Annmarie Cording, Law Offices of Randall M. Weiner, P.C., Boulder, Colorado on the briefs) on behalf of Plaintiffs-Appellants.

Casen B. Ross, Appellate Staff, Civil Division, United States Department of Justice, Washington, D.C. (Mark B. Stern, Appellate Staff, Civil Division, United States Department of Justice, Washington, D.C., Joseph H. Hunt, Assistant Attorney General, and Jason R. Dunn, United States Attorney, Washington, D.C. on the briefs) on behalf of the Defendant-Appellee.
_____

Before **HARTZ**, **MATHESON**, and **CARSON**, Circuit Judges.
_____

**HARTZ**, Circuit Judge.
_____

Shortly before 3:00 a.m. on June 12, 2016, Sarah Ball was killed when the car in which she was a passenger drove off United States Forest Service Road 456.1A and over an earthen mound before falling into an abandoned mine shaft about 20 feet off the road. Her parents and her estate (Plaintiffs) brought suit against the United States under the Federal Tort Claims Act (FTCA), raising several causes of action alleging negligence by the United States Forest Service. The United States District Court for the District of Colorado granted the government's motion to dismiss for lack of subject-matter jurisdiction, ruling that the government was immune from liability under the discretionary-function exception to the FTCA. Plaintiffs appeal. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## I.    BACKGROUND

The accident took place in the Arapaho and Roosevelt National Forests and Pawnee National Grassland (the Forest) within Region 2 of the National Forest System, which contains lands within five states. The area of the Forest exceeds 1.5 million acres. In Region 2 there are an estimated 11,500 remnants of abandoned mines (commonly referred to as abandoned-mine features), such as adits (the mine entrances), mine shafts, quarries and pits, tailing piles, and buildings. A 1993 survey identified 1329 such features in the Forest. There are over 2600 miles of road in the Forest, of which 1987 miles, including Forest Service Road 456.1A, are designated as Maintenance Level 2 roads.

The Forest Service Handbook describes the Level 2 designation as follows:

Assigned to roads open for use by high clearance vehicles. *Passenger car traffic, user comfort, and user convenience are not considerations. Warning signs and traffic control devices are not provided with the exception that some signing, such as W-18-1 "No Traffic Signs," may be posted at intersections. Motorists should have no expectations of being alerted to potential hazards while driving these roads.* Traffic is normally minor, usually consisting of one or a combination of administrative, permitted, dispersed recreation, or other specialized uses. Log haul may occur at this level. Appropriate traffic management strategies are either to:

    a. Discourage or prohibit passenger cars, or
    b. Accept or discourage high clearance vehicles

Aplt. App., Vol. I at 60 (emphasis added). The Forest Service Guidelines for Road Maintenance Levels similarly explain that Level 2 roads are "not suitable for passenger cars" and "[d]o not always provide motorists with alerts to potential hazards." *Id.* at 142. The publicly available Motor Vehicle Use Map prepared by the Forest Service for visitors to the Forest further states that "[m]aintenance of designated roads and trails will depend on available resources, and many may receive little maintenance." *Id.* at 61. The map also counsels that "[m]otor vehicle use, especially off-highway vehicle use, involves inherent risks that may cause property damage, serious injury, and possible death to participants." *Id.*

A Forest Service official submitted a sworn declaration explaining that the selection of which road-maintenance projects get funding requires balancing several priorities, including repairing roads with severe damage, maintaining roads where the Forest Service anticipates an upcoming project, and maintaining roads frequently used by the public for recreational activities. On average for the years between 2013 and 2017, the Forest Service had funding to perform maintenance of only 122 of the 1987 miles of

3

Level 2 roads in the Forest. Road 456.1A, however, has been considered to be in acceptable condition for its Level 2 classification and thus has not been designated for any maintenance or repair.

Not until 1998 did Congress make funds available to address the physical-safety hazards, as opposed to environmental concerns, posed by abandoned mines. The inventory of abandoned mines on Forest Service land and the mitigation of their hazards are conducted through the Environmental Compliance and Protection and Abandoned Mine Lands (ECAP/AML) Program. The Program's Forest-level managers request funding for specific projects from the Region manager who allocates available funds. As the Region 2 manager explained in his sworn declaration, "Funding for mitigating potential physical safety hazards associated with abandoned mine sites is limited and competes with funding for other Forest Service programs and priorities." *Id.* at 49.

If funding is obtained, the Forest-level manager has discretion on how to administer the project, including whether to partner with state or local entities or private organizations. In Colorado the Forest Service has a Master Participating Agreement with the Colorado Division of Reclamation, Mining, and Safety to address the abandoned mines in the state. Before any project can begin, the Forest Service must undertake various environmental reviews, including those required by the National Environmental Policy Act, and ensure compliance with agency standards, such as those in the Forest's own 1997 Land and Resource Management Plan, which has a standard to protect bats that use mines. In Region 2 between 2008 and 2016 the Forest Service and its partners were

4

able to mitigate only an average of 86 abandoned-mine features and associated hazards each year, of the over 11,500 in the Region.

## II.    DISCUSSION

### A.    The FTCA

The FTCA provides a limited waiver of sovereign immunity.  It allows private parties to bring civil suits against the United States for personal injury or death caused by the negligence or wrongful conduct of government employees within the scope of employment.  *See* 28 U.S.C. § 1346(b)(1); *Kiehn v. United States*, 984 F.2d 1100, 1102 (10th Cir. 1993).  The United States can be held liable only "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."  28 U.S.C. § 1346(b)(1).

There are also several statutory exceptions to the waiver of sovereign immunity.  In particular, the discretionary-function exception precludes holding the United States liable for an act or omission "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."  28 U.S.C. § 2680(a).  "The basis for the discretionary function exception was Congress' desire to prevent the judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort."  *Berkovitz v. United States*, 486 U.S. 531, 536–37 (1988) (internal quotation marks omitted).  The exception "marks the boundary between Congress' willingness to impose

5

tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals." *United States v. Varig Airlines*, 467 U.S. 797, 808 (1984).

To determine whether this exception applies, we employ the two-part test set out by the Supreme Court in *Berkovitz*. First, we "determine whether the challenged conduct 'involves an element of judgment or choice,' in which case it is discretionary and falls within the language of the exception, or whether it involves 'a federal statute, regulation, or policy that specifically prescribes a course of action for an employee to follow,' in which case the exception does not apply." *Kiehn*, 984 F.2d at 1102 (brackets omitted) (quoting *Berkovitz*, 486 U.S. at 536).

If the conduct was discretionary, we move to the second step and ask "'whether that judgment is the kind that the discretionary function exception was designed to shield.'" *Id.* at 1103 (quoting *Berkovitz*, 486 U.S. at 536). In particular, discretionary decisions "grounded in the social, economic, or political goals of the [governing] statute and regulations are protected." *United States v. Gaubert*, 499 U.S. 315, 323 (1991). Or, as this court has expressed the point, if the conduct "implicates the exercise of a policy judgment of a social, economic, or political nature," the discretionary-function exception shields the government from liability. *Duke v. Dep't of Agric.*, 131 F.3d 1407, 1411 (10th Cir. 1997).

The Supreme Court has provided guidance on how courts should determine whether this second prong is satisfied. "When established governmental policy, as

6

expressed or implied by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion, *it must be presumed that the agent's acts are grounded in policy* when exercising that discretion." *Gaubert*, 499 U.S. at 324 (emphasis added); *see Kiehn*, 984 F.2d at 1105 (ordinarily we "will not assume a nonpolicy decision unless the record shows something to the contrary"). That is, the complaint must be dismissed unless it "allege[s] facts which would support a finding that the challenged actions are not the kind of conduct that can be said to be grounded in the policy of the regulatory regime." *Gaubert*, 499 U.S. at 324–25.

Further, "[t]he focus of the inquiry is not on the agent's subjective intent in exercising the discretion conferred by statute or regulation, but on the nature of the actions taken and on whether they are susceptible to policy analysis." *Id.* at 325. Rather than "ask[ing] whether policy analysis is the *actual* reason for the decision in question," we ask "categorically (rather than case specifically) whether the kind of conduct at issue can be based on policy concerns." *Sydnes v. United States*, 523 F.3d 1179, 1185 (10th Cir. 2008) (internal quotation marks omitted) (in considering wrongful-termination claim under the FTCA, we would "not inquire into the intent of the government supervisor when making [the] specific personnel decision" but would ask instead whether "decisions regarding employment and termination" generally require consideration of policy factors (brackets and internal quotation marks omitted)). Thus, "it is unnecessary for government employees to make an actual conscious decision regarding policy factors" for the exception to apply. *Kiehn*, 984 F.2d at 1105 (internal quotation marks omitted).

7

"In fact, we have found it irrelevant whether the alleged failure to warn was a matter of deliberate choice, or a mere oversight." *Id.* (internal quotation marks omitted). In light of this approach, the absence of record evidence reflecting a policy analysis is immaterial. *See id.* (upholding application of discretionary-function exception even when government provided no evidence that National Park Service's failure to post warnings in remote areas of Dinosaur National Monument was a policy-based decision).

We review the applicability of the discretionary-function exception de novo. *See Duke*, 131 F.3d at 1409.

### B. Plaintiffs' Theory of Negligence

Plaintiffs complain that traveling west on Road 456.1A (as was Ms. Ball) the road appeared to divide into north and south forks near the abandoned mine shaft where the accident occurred (the Mine Shaft). The north fork was the proper continuation of the road, but Plaintiffs state that at the time of the accident the north fork was partially blocked by tree limbs about 6 to 8 feet above the road. The apparent south fork, which looked wider as one approached the intersection, was the path to the Mine Shaft. Plaintiffs allege that the Forest Service negligently constructed, remedied, and maintained Road 456.1A, creating dangerous conditions for drivers. In particular, they contend that because the Forest Service knew about the Mine Shaft's existence, it should have put up warning signs or otherwise prevented vehicles from falling into it, such as by filling the shaft or placing a barrier between the road and the hazard.

## C. Application of *Berkovitz* Prong One

To begin, we ask whether any statute, regulation, or policy required the Forest Service to take any of the precautions suggested by Plaintiffs. *See Kiehn*, 984 F.2d at 1102. If such an obligation existed, there would be no discretion for the exception (to the waiver of sovereign immunity) to protect. *See id.* In claiming that the government cannot advance past this first prong, Plaintiffs assert that § 2332.1 of the Forest Service Manual mandated the Forest Service to warn or guard against the hazard posed by the Mine Shaft.

Section 2332.1 requires that the agency do the following:

> To the extent practicable, eliminate safety hazards from *developed recreation sites*. Inspect each public recreation site annually before the beginning of the managed-use season. Maintain a record of the inspections and corrective actions taken with a copy of the operation and maintenance plan.
>
> Immediately correct high-priority hazards that develop or are identified during the operating season or close the site.

Forest Service Manual § 2332.1 (emphasis added). We question whether the accident occurred at a "developed recreation site." Plaintiffs' complaint alleges that Road 456.1A is used to provide "access to dispersed camping sites," Aplt. App.,    Vol. I at 16, and their reply brief asserts that § 2332.1 applies to such camping sites. The United States, however, contends that § 2332.1 is inapplicable because "developed recreation sites" have amenities and facilities that are absent from the area around the Mine Shaft and from dispersed camping sites.

9

But in any event, we need not consider Plaintiffs' argument on the applicability of § 2332.1 because, as pointed out by the government, Plaintiffs failed to present it below. In district court Plaintiffs never relied on, or even cited, § 2332.1. Because Plaintiffs failed to preserve their argument below and have not argued for relief under plain-error review, we consider the argument waived. *See Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1130–31 (10th Cir. 2011).[1]

Plaintiffs offer three arguments against our finding of waiver. First, they assert that the regulatory sources they relied on below (§§ 7730.5 and 7731 of the Forest Service Manual and language from the Forest Service Guidelines for Road Maintenance Levels, none of which they rely on in their briefs on appeal) were not intended to be exclusive examples of maintenance and safety requirements applicable to Road 456.1A. Second, they argue that because they relied on and the district court considered some parts of the Forest Service Manual, we cannot ignore the Manual's other provisions. Third, they invoke the statement in *United States v. Johnson*, 821 F.3d 1194, 1199 (10th Cir. 2016), that "[o]nce a federal claim is properly presented, a party can make any argument in support of that claim; parties are not limited to the precise arguments they made below." Aplt. Reply Br. at 20.

We are not persuaded. All three arguments rest on a misconception of the nature of appellate review. The proceedings in district court are not just a rehearsal, a dry run,

---

[1] The United States argues that Plaintiffs waived *any* challenge to the district court's holding on the first *Berkovitz* prong by failing to raise it in their opening brief. Because we reject the challenge on a narrower ground, we need not address the issue.

for the ultimate performance on appeal, where the parties can discard what did not work below and introduce new scenes for a new audience. We review the case litigated below, not the case fleshed out for the first time on appeal. In fairness to opposing parties and to prevent further burden on overburdened courts caused by interminable litigation, we expect parties "to give it everything they've got at the trial level." *Fish v. Kobach*, 840 F.3d 710, 730 (10th Cir. 2016) (internal quotation marks omitted). As we said when explaining the limitations of the language quoted above from *Johnson*, "Theories—as opposed to the overarching claims or legal rubrics that provide the foundation for them— are what matters." *Id.*

Plaintiffs' present reliance on § 2332.1 is not the addition of a mere nuance to the *Berkowitz* prong-one arguments made below (which were not pursued on appeal). It is a new theory. And adding it would be particularly unfair to the government in this case because it has had no opportunity to make a record regarding the meaning of § 2332.1.[2]

## D.  Application of *Berkovitz* Prong Two

Because Plaintiffs have failed to show that a policy, statute, or regulation required the Forest Service to take the actions suggested by Plaintiffs, we advance to the second *Berkovitz* prong. At this step we ask whether the Service's decision not to post a warning sign or make site improvements at the Mine Shaft is the kind of judgment "that the discretionary function exception was designed to shield," *Berkovitz*, 486 U.S. at 536—

---

[2] The United States claimed at oral argument that it has evidence establishing that the accident site is not a "developed recreation site" to which the duties in § 2332.1 apply, but that it did not offer this evidence in district court because Plaintiffs did not rely on § 2332.1 below.

that is, whether the decision "implicates the exercise of a policy judgment of a social, economic, or political nature," *Duke*, 131 F.3d at 1411.

Plaintiffs argue that the second prong is not satisfied because the United States failed to provide evidence showing that the Forest Service's decision not to warn or otherwise protect against the hazard posed by the Mine Shaft and Road 456.1A was grounded in policy considerations. But this contention is misguided in at least two respects.

First, Plaintiffs misunderstand the relevant burden. As the Supreme Court said in *Gaubert*, we *presume* that a government agency's acts are grounded in policy when no statute, regulation, or policy sets forth a required course of conduct; the challenger must allege facts showing otherwise. *See* 499 U.S. at 324–25. Having already determined that the first *Berkowitz* prong was met, we presume that the Forest Service's decision-making was policy-based unless Plaintiffs direct us to facts to the contrary.

Second, Plaintiffs incorrectly describe the nature and scope of the second-prong inquiry. "Application of *Berkovitz*'s second prong does not require proof of the thought processes of the pertinent decisionmakers." *Elder v. United States*, 312 F.3d 1172, 1182 (10th Cir. 2002). Rather, the focus of the inquiry is more generally "on the nature of the actions taken and on whether they are susceptible to policy analysis." *Gaubert*, 499 U.S. at 325.

To the extent that Plaintiffs contend that our decision in *Hardscrabble Ranch, L.L.C. v. United States*, 840 F.3d 1216 (10th Cir. 2016), held that evidence of the

12

agency's thought processes is required, they misread that opinion. The plaintiffs' FTCA claim in that case challenged the Forest Service's response to a fire that damaged their property. *See id.* at 1217. The plaintiffs attempted to rebut the *Gaubert* presumption by arguing that the Forest Service failed to follow its own "Decision Checklist," which guides the Service's response to wildfires, and by criticizing other aspects of the response. *See id.* at 1222. We explained, however, that the Service's actual response to the fire was not our focus. *See id.* Instead, the second *Berkowitz* prong was satisfied because "the [Forest Service] actions in fighting the Sand Gulch Fire [were] susceptible to a policy analysis grounded in social, economic, or political concerns," namely "the balancing of the needs to protect private property, ensure firefighter safety, reduce fuel levels, and encourage natural ecological development." *Id.* We noted that these concerns were consistent with those raised by questions in the Decision Checklist and the Forest Service's formal Incident Decision regarding the fire. *See id.* at 1222–23. But we did not say that the expression of policy rationales in the Decision Checklist and Incident Decision was necessary to satisfy the second prong. Those documents simply confirmed the relevance of the policy concerns we identified.

In sum, our inquiry here is whether the Forest Service's decisions about warning or guarding against the dangers posed by off-road hazards, including abandoned-mine features, implicate protected policy judgments. It is not, as Plaintiffs argue, whether there is evidence that the inaction specific to the Mine Shaft and Road 456.1A was

13

grounded in policy. And following *Gaubert*, we presume that the Forest Service's decision-making was policy-based.

In an effort to show that policy considerations did not underlie Forest Service inaction with respect to warning signs or barriers, Plaintiffs point to the declarations offered by several Forest Service officials. Plaintiffs observe that although the declarations addressed several issues directly tied to the negligence alleged by Plaintiffs in their complaint (such as deficient road maintenance and failure to fill in abandoned mines), the declarations make no specific mention of warning signs or barriers. Plaintiffs contend that this omission therefore suggests that no policy-based reasoning informed the Forest Service's decision not to use such safety measures.

It is not unreasonable to infer that when an agency provides policy reasons for some decisions, its failure to identify policy reasons for other, related decisions may suggest that none exist. Still, the failure of the declarations to mention concerns specific to warnings signs and barriers does not negate the *Gaubert* presumption. *See* 499 U.S. at 324–25 (presumption is triggered whenever regulatory scheme allows agency or official to exercise discretion). Further, as we explain below, the Forest Service's decisions whether to employ warning signs or barriers *are* susceptible to the types of policy analysis protected by the discretionary-function exception—even if not spelled out in the declarations.

Our precedents have regularly applied the discretionary-function exception to protect a decision not to post warning signs on land managed for public recreation when

the decision "inherently requires a balancing of public policy objectives, such as resource allocation, visitor safety and scenic preservation." *See Kiehn*, 984 F.2d at 1105;[3] *see also Johnson v. U.S. Dep't of Interior*, 949 F.2d 332, 338 (10th Cir. 1991) ("[T]he Park Service's decision not to place additional warnings in the Teton Range, whether explicit or implicit, was part of the overall policy decision to limit governmental regulation of climbing, educate climbers via the permit system, and preserve the Park in accordance with the statutory directive. This decision cannot be divorced from the overall policy not to engage in strict regulation of climbing activity in the Park."); *Zumwalt v. United States*, 928 F.2d 951, 955 (10th Cir. 1991) (decision not to post warnings along trail "was part of the overall policy decision to maintain the Trail in its wilderness state").

Other appellate courts have adopted the same approach. The Eleventh Circuit's decision in *Autery v. United States*, 992 F.2d 1523 (11th Cir. 1993) is instructive. A tree in Great Smokey Mountain National Park had fallen on a car, killing the driver and injuring the passenger. *See id.* at 1524. The surviving passenger and the administratrix of the driver's estate sued the United States under the FTCA, alleging that the National Park Service was negligent in its inspection of potentially hazardous trees and its response to discovering such hazards. *See id.* After determining that no policy, statute,

---

[3] Plaintiffs suggest that prioritization of resources cannot by itself be a sufficient policy reason for failure to act. For that proposition they cite *Boyd v. United States ex rel. U.S. Army, Corps of Engineers*, 881 F.2d 895, 897–98 (10th Cir. 1989). But that is a misreading of that opinion. The cited passage merely states that the decision, based on protected policy judgments, to allow both boating and swimming in the same portion of a lake does not automatically establish that the decision not to post warning signs was also a policy decision. The warning-sign decision had to be examined independently.

15

or regulation obligated the Park Service to develop and implement a particular tree-inspection protocol, *see id.* at 1530, the court addressed the second *Berkovitz* prong, considering the problem of hazardous trees as a group, rather than focusing on the one tree that hit the car:

> To decide on a method of inspecting potentially hazardous trees, and in carrying out the plan, the Park Service likely had to determine and weigh the risk of harm from trees in various locations, the need for other safety programs, the extent to which the natural state of the forest should be preserved, and the limited financial and human resources available.

*Id.* at 1531. The court therefore held that the Park Service's "choices involved in such a development and implementation [were] grounded in social, economic and public policy" and thus protected by the discretionary-function exception. *See id.* at 1530–31; *see also Gonzalez v. United States*, 851 F.3d 538, 548 (5th Cir. 2017) ("Decisions about how to maintain bicycle trails running through 382,000 acres of land with only two recreation technicians seem to invite, if not require, safety, financial, and other feasibility concerns. Such decisions implicate resource allocation, wilderness considerations, and public safety; in other words, they are administrative decisions grounded in social, economic, and political policy." (internal quotation marks omitted)); *cf. Varig Airlines*, 467 U.S. at 819–20 (decision-making requiring "agency to establish priorities for the accomplishment of its policy objectives by balancing the objectives sought to be obtained against such practical considerations as staffing and funding" was "plainly discretionary activity of the 'nature and quality' protected by § 2680(a)").

16

The law just summarized compels rejection of Plaintiffs' argument on the *Berkovitz* second prong. If the government is liable for not posting the warning or putting up the barrier suggested by Plaintiffs at the site of the tragic accident in this case, it could protect itself from future liability only by regularly examining all 1329 mine features and all 1987 miles of Level 2 roads in the Forest for possible hazards and then, at the least, posting warning signs to alert motorists to the hazards. The impact on the Forest Service budget would be significant, requiring reordering of priorities from other activities. And posting the number of warning signs that would evidently be required could not help but detract from the scenic beauty of the Forest, making it a far less attractive place to try to "get away from it all." Perhaps the additional protection of life and limb would be worth those costs. But the Forest Service could decide that adequate protection is afforded by the warnings provided by the Motor Vehicle Use Map, its existing road-maintenance and mine-closure policies and projects, and the good sense of motorists in the Forest. In any event, that is a policy decision protected by the discretionary-function exception.

Plaintiffs contend that the discretionary-function exception does not apply to the failure to warn of "specific hazards," citing in support *Duke v. Department of Agriculture*, 131 F.3d 1407 (10th Cir. 1997); *Boyd v. United States ex rel. U.S. Army, Corps of Engineers*, 881 F.2d 895 (10th Cir. 1989); and *Smith v. United States*, 546 F.2d 872 (10th Cir. 1976). But the term *specific hazard*, although it can be factually descriptive, *does not* and, if we are to comply with Supreme Court precedent, *cannot* change the analysis of when the discretionary-function exception applies. None of the

17

cited cases rejected, or could have rejected, the proposition that the discretionary-function exception protects government decisions "grounded in social, economic, and political policy." *Berkowitz*, 486 U.S. at 536–37; *see Duke*, 131 F.3d at 1409 (quoting *Berkowitz*); *Boyd*, 881 F.2d at 897 (same); *Smith*, 546 F.2d at 877 (predating *Berkowitz* but recognizing presence of policy judgments as dispositive issue in deciding whether exercise of discretion is protected by discretionary-function exception). They simply held that there were no such policy judgments behind the failures in those cases. *See Duke*, 131 F.3d at 1412; *Boyd*, 881 F.2d at 898; *Smith*, 546 F.2d at 877. (We should note, however, that perhaps *Smith* and *Boyd*, which were decided before *Gaubert*, would have been decided differently if they had applied the *Gaubert* presumption that discretionary decisions of government officials are grounded in the requisite policy.)

The gist of Plaintiffs' theory appears to be that the conditions at the accident site posed a unique "specific hazard" that could have been dealt with in a way that posed no policy issues. After all, putting up one sign takes little time, effort, or money and would not significantly detract from the scenic virtues of the Forest. But courts are not to examine government decisions at that individualized scale. A judicial decision with respect to one Forest site may have implications for numerous other similar sites. We alluded to this point in *Elder*, where the plaintiffs challenged the adequacy of warning signage at an attraction in Zion National Park:

> [O]ne cannot isolate a particular possible warning sign (or other safety measure, for that matter) and say whether its absence constitutes negligence. The adequacy of one safety measure depends on what other safety measures have been taken. If there is negligence, it is negligence in

18

> the design of the entire safety package.  Yet park management must judge the totality of the safety package in terms of its impact on other public policies besides safety.

312 F.3d at 1183–84.  By disapproving of the Forest Service's decision with respect to the Mine Shaft off Road 456.1A, we would be setting Forest Service policy for all mine shafts and Level 2 roads.  If it was required to act at the site of this accident, it would be required to make individualized decisions at hundreds of other locations.  But the discretionary-function exception was adopted precisely to avoid such judicial interference in administrative policy.  *See Berkovitz*, 486 U.S. at 536–37 ("The basis for the discretionary function exception was Congress' desire to prevent the judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort."  (internal quotation marks omitted)). The FTCA forbids courts from assuming a policy-making role through the adjudication of tort claims.

We conclude that the Forest Service's need to balance limited financial and human resources, public safety, and scenic preservation in creating and executing its safety and maintenance plan for off-road hazards, including abandoned-mine features, makes the challenged inaction squarely the type of decision that the discretionary-function exception aims to protect from "judicial second-guessing." *Id.*

**III.   CONCLUSION**

We **AFFIRM** the district court's dismissal of Plaintiffs' suit.

19