FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| ALFREDO CRUZ ESQUIVEL, *Plaintiff-Appellant,* and DONALD DAVID WILLARD, *Plaintiff,* v. UNITED STATES OF AMERICA, acting through its agent Bureau of Land Management; ARMANDO FORSECA, an individual, in both his personal and representative capacities; TOM DOE, a Bureau of Land Management Employee or Contractor, in both his personal and representative capacities, *Defendants-Appellees.* | No. 20-35868 D.C. No. 2:18-cv-00148-SAB OPINION |

Appeal from the United States District Court
for the Eastern District of Washington
Stanley A. Bastian, Chief District Judge, Presiding

Argued and Submitted November 9, 2021
Seattle, Washington

Filed December 17, 2021

Before:  Ronald M. Gould, Richard C. Tallman, and
         Patrick J. Bumatay, Circuit Judges.

Opinion by Judge Tallman

---

## SUMMARY[*]

---

### Federal Tort Claims Act

The panel affirmed the district court's dismissal for lack of subject matter jurisdiction of a Federal Tort Claims Act ("FTCA") action seeking damages when appellants' property was intentionally burned by a Type 2 Incident Management Team, convened by the U.S. Forest Service, during a controlled burnout performed as part of the fire suppression effort to combat the 2015 North Star Fire in Washington.

The district court dismissed based on its holding that the FTCA claims fell within the discretionary function exception to the FTCA's waiver of sovereign immunity, and the FTCA's misrepresentation exception.

Concerning the discretionary function exception, the panel first considered whether the communications, regarding the precautionary measures that the fire crew would take while conducting the burnout, between Bureau of Land Management employee Thomas McKibben and property resident Donald Willard involved an element of

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

judgment or choice. Appellants did not dispute that McKibben's communications with Willard were discretionary. In addition, the government cited to numerous provisions of the Forest Service Manual ("FSM") that exuded discretion by the Forest Service when determining how best to fight wildland fires. The panel concluded that McKibben's statements to Willard were discretionary.

The panel next considered whether the communications reflected the exercise of judgment grounded in social, economic, or political policy. The panel held that McKibben's communication with Willard was based upon the exercise or performance of choosing how to organize and conduct fire suppression operations, which indisputably required the exercise of judgment grounded in social, economic, or political policy. The panel concluded that the government met its burden of establishing that appellants' claims fell within the scope of the discretionary function exception.

The panel next considered whether appellants' claims were independently barred by the FTCA's misrepresentation exception. Under this exception, claims against the United States for fraud or misrepresentation by a federal officer are absolutely barred. Appellants argued that they suffered a loss (the burning of 15 acres) as a result of Willard's decision to leave the property, made in reliance on McKibben's intentionally false statement that he would use foam or control the burnout. The panel held that the alleged misrepresentation in this case was not collateral to the gravamen of the complaint. By Willard's own account, the alleged misrepresentations were within the chain of causative events upon which their claim was founded, and within the misrepresentation exception. The panel concluded that the claims regarding McKibben's

communications with Willard were independently barred by the FTCA's misrepresentation exception.

Finally, the panel considered whether the district court made improper factual findings in resolving the Fed. R. Civ. P. 12(b)(1) motion and improperly denied additional jurisdictional discovery in the case. The panel held that contrary to appellants' argument, the district court was not resolving serious matters of credibility on a summary basis, but instead the district court was viewing the facts alleged in the light most favorable to appellants and concluding that, even were it to take those facts as true, the court lacked subject matter jurisdiction over the case. This was not error. The panel held further that the district court did not abuse its discretion in refusing to allow further jurisdictional discovery.

## COUNSEL

William C. Schroeder (argued), KSB Litigation, P.S., Spokane, Washington, for Plaintiff-Appellant.

Joshua Dos Santos (argued) and Mark B. Stern, Appellate Staff; Joseph H. Harrington, Acting United States Attorney; Brian M. Boynton, Acting Assistant Attorney General; Civil Division, United States Department of Justice, Washington, D.C.; for Defendant-Appellee.

**OPINION**

TALLMAN, Circuit Judge:

> *"Of all the foes which attack the woodlands of North America no other is so terrible as fire."*
>
>> - Gifford Pinchot, First Chief of the United States Forest Service

Appellants Alfredo Esquivel and Donald Willard appeal the district court's dismissal for lack of subject matter jurisdiction of their claims for damages brought against the United States under the Federal Tort Claims Act (FTCA), 28 U.S.C. § 1346(b).  Fifteen acres of Appellants' property was intentionally burned by a Type 2 Incident Management Team, convened by the United States Forest Service, during a controlled burnout performed as part of the fire suppression effort to combat the approximately 217,000-acre 2015 North Star Fire in northeastern Washington.  Appellants allege they relied on promises by the fire crew to use certain precautionary measures while performing the burnout, and the negligent failure by the crew to employ such measures caused unnecessary additional acreage to be destroyed by the fire.

The district court held the United States was immune from suit because the claims fell within the discretionary function exception to the FTCA's waiver of sovereign immunity, and to the extent that Appellants' claims were based on allegations that the fire crew lied to Appellants to induce consent to perform the burnout, those claims were also barred by the FTCA's misrepresentation exception.  The court subsequently denied Appellants' request for jurisdictional discovery, finding that it was unlikely that any

facts existed that would make the discretionary function exception inapplicable.

We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm the district court's dismissal for lack of subject matter jurisdiction and denial of additional jurisdictional discovery.

I

A

On August 12, 2015, the human-caused North Star Fire began to burn on the Colville Indian Reservation in northeastern Washington.[1]  The fire eventually combined with several other naturally caused fires—including the large and complex Tunk Block Fire—to form the Okanogan Fire Complex.  The Okanogan Fire Complex was then the largest wildfire in Washington State's history and burned more than 300,000 acres throughout the Colville Indian Reservation, the Colville National Forest, and Okanogan and Ferry counties.

The North Star Fire was assigned to a Type 2 Incident Management Team (IMT) by the United States Forest Service, and consisted of federal, state, local, and tribal firefighters.  The firefighting operations conducted by the IMT were principally governed by Chapter 5100 of the Forest Service Manual (FSM), which is devoted to wildland

---

[1] We summarize the facts on this Rule 12(b)(1) motion in the light most favorable to Appellants, who resisted dismissal below.  *See Terbush v. United States*, 516 F.3d 1125, 1128 (9th Cir. 2008).

fire management.[2]  The IMT included a Structure Group, led by Division Supervisor and Structure Protection Specialist Thomas McKibbin, who was then employed by the Bureau of Land Management (BLM).

On August 22, 2015, the Structure Group was assigned by the Operations Section Chief to assess potential threats to, and protect, the ranch property of Alfredo Esquivel and Donald Willard[3]—an 89.7-acre parcel near Nespelem, Washington.  When he reached the scene with his crew, Division Supervisor McKibbin concluded that the advancing North Star Fire posed an extreme risk to the buildings and structures on the land.  McKibbin therefore ordered fire defensive measures.  Specifically, McKibbin directed his firefighters to create a fire break from a two-track dirt road that ran along the property, and to employ a burnout fire[4] near the road to widen and reinforce the break.

Before McKibbin and his team implemented the defensive measures, McKibbin spoke with Donald Willard

[2] The IMT responsible for fighting the North Star Fire was also required to follow the Master Cooperative Wildland Fire Management and Stafford Act Response Agreement, an agreement entered into among various state and federal agencies in the Pacific Northwest to share resources when mutual aid is required.

[3] Although Willard did not actually own the 89.7-acre parcel—and his relationship to Esquivel is unclear (there is some indication in the record that he is Esquivel's nephew)—he lived on Esquivel's property at the time.

[4] A burnout fire, as its name suggests, is a controlled, low-intensity fire that is designed to burn out only the most flammable fuel sources (i.e., vegetation) near the fire line.  Once these fuels are consumed, the burnout is finished.  The end result is a black space that hopefully stops the encroaching wildfire from further advancing.

who was then living in a motor home on the property. According to McKibbin, Willard expressed distrust of the federal government and worried that firefighters intended to excessively burn his land to save adjacent federal lands. McKibbin responded by assuring Willard that this was not the case, and that his crew was there to protect Willard's property. According to Willard, McKibbin also responded that Willard "didn't have to worry about excessive burning because he and his crew were going to spray foam around the area so that the fire could not spread very far."

Willard later swore that McKibbin "convinced" him that the team "would protect [the] property and make sure that [the] property would not be excessively burned." Willard also declared that when he was told about the foam he thought "it would be safe for [him] to leave." McKibbin swears he does not recall any discussion of foam in his conversation with Willard. He also states in his declaration before the district court that it would be highly unusual for foam to be used during a burnout because foam is typically used only to contain the advance of a *wildfire*, while burnouts are performed under controlled conditions and normally do not need to be contained. McKibbin also swears that if "Willard had wanted to forego a burnout, [McKibbin] would not have done one." "That would have put the entire property at extreme risk, but it was [Willard's] prerogative to take the risk if [Willard] wanted to."

After Willard consented to the burnout, McKibbin and his team began to implement the defensive measures. McKibbin stated that the fire crew "introduced a low-intensity fire along [the] fire line, which was in a remote corner of the property, and then allowed it to burn out under close observation." The crew then "secured the fire line, ceased operations, and monitored the area until [they] were

confident the line would keep the wildfire from advancing through the night." The team remained on the property until "well after dark," by which point the "vegetation along the fire line had been fully consumed." After the crew ensured that any residual fire was not a threat, they left to eat, debrief with their commanders, and sleep.

Willard left the property at 7:30 p.m., when, according to him, "the only fire in sight was about a quarter mile away and was small enough that [he] could have kept it at bay alone." Willard returned to the property the next day around 7:15 a.m. He smelled propane coming from his motorhome and found the pilot light had gone out. After he attended to this threat, Willard "noticed the snapping noise of fire coming from up the hill where [McKibbin] had set up the BLM burn camp the night before." Willard rushed to the top of the hill, where he saw "an active fire consuming [his] backyard without any restriction or inhibition" and noticed "that there was no fire watch, no foam had been sprayed anywhere, and that there were no precautions taken to prevent [the] property from being completely consumed by fire." Willard asserts that he fought the fire singlehandedly from about 8:00 a.m. to 1:00 p.m., when McKibbin and his crew returned to the property.

Shortly after the fire crew returned, according to McKibbin, Willard approached him. The nature of the ensuing conversation is disputed. McKibbin alleges that Willard confronted him, claiming that the federal government was intentionally burning his private property to protect federal lands, and became aggressive to the point that McKibbin began to fear for his safety and the safety of his crew. Willard, on the other hand, maintains that he asked McKibbin why the fire was left unattended and precautions such as foam had not been used, and that he was respectful,

though frustrated and concerned. After the incident was relayed by McKibbin to IMT Operations Chief Paul Delmerico, McKibbin and his crew were instructed to leave Appellants' property in order to protect firefighter safety. Willard asserts that McKibbin left without answering his questions about why foam was not sprayed or why the burnout had been left unsupervised overnight.

According to Willard, the fire set by McKibbin and his team burned 15 acres of the property, and if McKibbin had told Willard "that he was planning to abandon a burning fire on [the] property, then [Willard] would have come back to save [his] land."

B

On May 15, 2017, Appellants filed an administrative claim with the BLM, seeking $5 million in damages stemming from the fire damage to the property. Appellants alleged that their damages resulted from BLM's negligent fighting of the North Star Fire, including the negligent performance of the burnout. On November 13, 2017, BLM denied the claims on the basis that Appellants failed to provide evidence of negligence by a BLM employee and failed to provide evidence supporting their damages claim.

After exhausting administrative remedies, Appellants filed suit in the United States District Court for the Eastern District of Washington in May 2018, bringing claims under the Federal Tort Claims Act.[5] The government subsequently

---

[5] In addition to FTCA claims, the complaint included claims under 42 U.S.C. § 1983 and *Bivens*. The civil rights claims were voluntarily dismissed and are not relevant to this appeal.

filed a motion to dismiss Appellants' FTCA claims for lack of subject matter jurisdiction.

The district court granted the government's motion on February 6, 2020.  The court first concluded that it "lack[ed] jurisdiction over Plaintiffs' FTCA claims because the claims fall within the discretionary function exception to the FTCA's waiver of sovereign immunity," and to the extent that Appellants' arguments were based on allegations that McKibbin lied to Willard about the precautionary measures his team would take, such statements would fall within the FTCA's misrepresentation exception.  The court further denied Appellants' request for jurisdictional discovery, finding that Esquivel and Willard were given "the same opportunity to engage in jurisdictional discovery as were Defendants" and that it was unlikely that any facts existed that would make the discretionary function exception inapplicable.

Final judgment was entered on September 15, 2020, and Appellants timely appealed.

II

We review *de novo* the district court's determination that it lacks subject matter jurisdiction under the FTCA.  *Green v. United States*, 630 F.3d 1245, 1248 (9th Cir. 2011).  In reviewing the district court's dismissal for lack of subject matter jurisdiction, we must accept as true the factual allegations in the complaint.  *See Terbush v. United States*, 516 F.3d 1125, 1128 (9th Cir. 2008).

The district court's decision to deny jurisdictional discovery is reviewed for abuse of discretion.  *See Gonzalez v. United States*, 814 F.3d 1022, 1031–32 (9th Cir. 2016).

### III

We first address whether Appellants' claims about the burnout are viable under the FTCA. "An action can be brought by a party against the United States only to the extent that the Federal Government waives its sovereign immunity." *Blackburn v. United States*, 100 F.3d 1426, 1429 (9th Cir. 1996). If sovereign immunity has not been waived, the court must dismiss the case for lack of subject matter jurisdiction. *See FDIC v. Meyer*, 510 U.S. 471, 475 (1994). Under the FTCA, the United States has waived its sovereign immunity for certain tort claims. The Act specifically provides jurisdiction to district courts over

> civil actions on claims against the United States, for money damages . . . for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b)(1). The United States and its agents can therefore be held liable with respect to tort claims "in the same manner and to the same extent as a private individual under like circumstances . . . ." *Id.* § 2674.

"The Act did not waive the sovereign immunity of the United States in all respects, however; Congress was careful to except from the Act's broad waiver of immunity several important classes of tort claims." *United States v. S.A. Empresa de Viacao Aerea Rio Grandense* (*Varig Airlines*),

467 U.S. 797, 808 (1984).  Of particular relevance here is the discretionary function exception, 28 U.S.C. § 2680(a), and the misrepresentation exception, *id.* § 2680(h).  We address the applicability of each in turn.

A

Under the discretionary function exception to the FTCA, the United States preserves its sovereign immunity from suit as to

> [a]ny claim based upon an act or omission of an employee of the Government . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

*Id.* § 2680(a).  "The discretionary function exception . . . marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals." *Varig Airlines*, 467 U.S. at 808. Congress enacted this exception to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *Id.* at 814.

The Supreme Court has created a two-step test to determine whether the discretionary function exception can be invoked.  *See United States v. Gaubert*, 499 U.S. 315, 322–23 (1991); *Berkovitz v. United States*, 486 U.S. 531, 535–37 (1988).  First, courts must determine whether the challenged actions involve an "element of judgment or

choice." *Gaubert*, 499 U.S. at 322. This inquiry looks at the "nature of the conduct, rather than the status of the actor" and the discretionary element is not met where "a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow." *Berkovitz*, 486 U.S. at 536. If there is such a statute or policy directing mandatory and specific action, the inquiry comes to an end because there can be no element of discretion when an employee "has no rightful option but to adhere to the directive." *Id.*

"When a specific course of action is not prescribed, however, an element of choice or judgment is likely involved in the decision or action." *Terbush*, 516 F.3d at 1129. In that case, the court moves to the second step and must determine "whether that judgment is of the kind that the discretionary function exception was designed to shield." *Berkovitz*, 486 U.S. at 536. Namely, the exception protects only government actions and decisions based on "social, economic, and political policy." *Id.* at 537. Where the government agent is exercising discretion, "it must be presumed that the agent's acts are grounded in policy when exercising that discretion." *Gaubert*, 499 U.S. at 324.

"If the challenged action satisfies both of these two prongs, that action is immune from suit—and federal courts lack subject matter jurisdiction—even if the court thinks the government abused its discretion or made the wrong choice." *Green*, 630 F.3d at 1249–50. "The plaintiff has the burden of showing there are genuine issues of material fact as to whether the exception should apply, but the government bears the ultimate burden of establishing that the exception applies." *Id.* at 1248–49. "[N]egligence is . . . irrelevant to the discretionary function inquiry." *Kennewick*

*Irrigation Dist. v. United States*, 880 F.2d 1018, 1029 (9th Cir. 1989).

Appellants here do not challenge that the discretionary function exception applies to the fire crew's decision to perform, and the subsequent performance of, a burnout on their property. Instead, they challenge McKibbin's statements regarding the precautionary measures that the fire crew would take while conducting the burnout. This is understandable, since our precedent already establishes that claims involving how the government conducts fire suppression operations are generally barred by the discretionary function exception. *See Miller v. United States*, 163 F.3d 591 (9th Cir. 1998); *see also Parsons v. United States*, 811 F. Supp. 1411 (E.D. Cal. 1992); *Defrees v. United States*, 738 F. Supp. 380 (D. Or. 1990).[6] We therefore turn to whether McKibbin's *communication* with Willard falls within the discretionary function exception.

1

First, we examine whether the communication between McKibbin and Willard involved an element of judgment or

---

[6] Precedent from other circuits also establishes that claims challenging the performance of fire suppression operations are generally barred by the discretionary function exception, *see Hardscrabble Ranch, LLC v. United States*, 840 F.3d 1216 (10th Cir. 2016); *cf. Foster Logging, Inc. v. United States,* 973 F.3d 1152 (11th Cir. 2020), as do numerous unreported cases from our circuit, *see Woodward Stuckart, LLC v. United States*, 650 F. App'x 380 (9th Cir. 2016) (unpublished); *Dovenberg v. United States*, 407 F. App'x 149 (9th Cir. 2010) (unpublished); *Backfire 2000 v. United States*, 273 F. App'x 661 (9th Cir. 2008) (unpublished); *Cary v. United States*, No. 06-CV-2342-DMS, 2008 WL 11508582 (S.D. Cal. Mar. 12, 2008) (unpublished); *Graves v. United States*, No. CIVS05-1661 FCD GGH, 2007 WL 776101 (E.D. Cal. Mar. 12, 2007) (unpublished).

choice.  *See Gaubert*, 499 U.S. at 322.  Here, Appellants do not dispute that McKibbin's communications with Willard were discretionary, nor do they direct us to any statute, regulation, or policy that dictates the precise manner in which fire crews are to communicate with landowners when conducting burnouts on their property.

On the other hand, the government cites to numerous provisions of the FSM that exude discretion by the Forest Service when determining how best to fight wildland fires. For example, the FSM states that "the nature of the wildland fire environment is often dynamic, chaotic, and unpredictable," in "such an environment, reasonable discretion in decision-making may be required," and "Forest Service employees must use their best judgment in applying the guidance contained in these references to real-life situations."  These quoted provisions clearly do not prescribe a mandatory course of action, and indeed, this court has found other FSM provisions to be discretionary.  *See Miller*, 163 F.3d at 594–95; *Green*, 630 F.3d at 1250–51.  This discretion also extends beyond decisions about whether and how to conduct fire suppression operations—it includes decisions regarding whether to communicate with landowners about fire suppression operations potentially affecting their land.  *See Green*, 630 F.3d at 1250–51 (concluding that the Forest Service's decision whether to notify landowners about the dangers posed by a nearby backfire was discretionary).

For these reasons, we conclude that McKibbin's statements to Willard were discretionary.

### 2

Having determined that the statements were discretionary, we must next consider whether the

communication reflects the exercise of judgment grounded in social, economic, or political policy. *See Berkovitz*, 486 U.S. at 537.

In *Miller*, the Forest Service failed to contain the Bald Butte Fire due to a lack of availability of air and ground support when the fire was first spotted. 163 F.3d at 592. Shortly thereafter, the fire was declared "escaped," and the fire management officer determined it was unsafe to commit resources to fight the fire at that time. *Id.* On-the-ground fire suppression efforts did not occur until the next day, at which point the Bald Butte Fire joined two other fires and crossed onto the Millers' property causing damage. *Id.* at 592–93.

We held in *Miller* that the Forest Service's choices in how to fight a fire are "susceptible to a policy analysis" since the Forest Service Manual's stated objectives and policies demonstrated

> the Forest Service's decision regarding how to attack a fire involved a balancing of considerations, including cost, public safety, firefighter safety, and resource damage. These considerations reflect the type of economic, social and political concerns that the discretionary function exception is designed to protect.

*Id.* at 595. Our decision in *Miller* makes clear that decisions regarding how to perform fire suppression operations are policy-based decisions covered by the discretionary function exception.

As discussed above, however, Appellants do not challenge the decision to perform, and the subsequent

performance of, fire suppression efforts on their property. Instead, Appellants' challenge McKibbin's statements to Willard regarding the precautionary measures the fire crew would take.   Appellants therefore argue that *Miller* is inapplicable to this case.  We disagree.

Under the FTCA, the discretionary function exception covers any claim "*based upon* the *exercise or performance* or the failure to exercise or perform a discretionary function or duty . . . whether or not the discretion involved be abused."  28 U.S.C. § 2680(a) (emphasis added).  In other words, the exception covers any conduct that is "based upon" the performance of an act that otherwise falls within the discretionary function exception.  Although the FTCA does not define the phrase "based upon," in a similar context the Supreme Court has explained that "the phrase is read most naturally to mean those elements of a claim that, if proven, would entitle a plaintiff to relief under his theory of the case." *Saudi Arabia v. Nelson*, 507 U.S. 349, 357 (1993) (addressing use of the phrase in the Foreign Sovereign Immunities Act).

Since *Miller* establishes that decisions regarding whether and how to perform fire suppression operations are discretionary functions rooted in policy, the discretionary function exception extends to all other conduct "based upon the exercise or performance" of these operations.   A communication between fire crews and property owners is therefore covered by the discretionary function exception under 28 U.S.C. § 2680(a) if such communication was based upon the performance of fire suppression operations.  For this reason, we conclude that to be entitled to relief, Appellants would need to meet their burden of alleging facts showing that there is a genuine dispute as to whether McKibbin's statements to Willard were part of the decision

to set, and the subsequent conduct of, the burnout—which is undisputedly a policy-based decision covered by the discretionary function exception. *See Miller*, 163 F.3d at 595–97.

Here, Appellants cannot make such a showing. By Willard's own admission, right before beginning work on the burnout, McKibbin told Willard "that he was going to have to burn some of my land to make a firebreak in order to save the rest of my land and my home." Also, according to Willard, McKibbin convinced him that the team "would protect [the] property and make sure that [the] property would not be excessively burned." This conversation, including the alleged misstatements regarding the use of foam, took place right before the burnout began and consisted entirely of discussion about whether, where, and how to set and manage the burnout. And, by McKibbin's account, if "Willard had wanted to forego a burnout, [McKibbin] would not have done one. That would have put the entire property at extreme risk, but it was [Willard's] prerogative to take the risk if [Willard] wanted to." These statements all support the conclusion that the conversation between McKibbin and Willard concerned how to organize and conduct suppression operations (in this case, a burnout) which, according to the FSM, are discretionary decisions governed by policy considerations.

Appellants rely heavily on *Green* to argue that communications between fire crews and property owners are not covered by the discretionary function exception. In *Green*, the Forest Service discovered the Bullock Fire burning in a remote area of the Coronado National Forest and set containment boundaries for the fire, including

starting a backfire[7] near the appellant-homeowners' private properties.    630 F.3d at 1247–48.    The Forest Service, however, "did not take any action to protect Appellants' properties," including informing the homeowners about the backfire being set or the risk to their land.  *Id.*  The backfire ultimately exceeded the containment area and burned the homeowners' properties.  *Id.* at 1248.    The homeowners sued, contending that "the Forest Service's *failure to notify* Appellants before and after the Forest Service lit the backfire" prevented the discretionary function exception from applying.  *Id.* at 1252 (emphasis in original).  We held that the Forest Service's failure to notify the property owners had not been shown to be "susceptible to a policy analysis grounded in social, economic, or political concerns," *id.* at 1247, since there was no evidence that policy analysis was needed when making the decision of whether to notify landowners of a nearby backfire and potential danger to their land, *id.* at 1251–52.

But *Green* is distinguishable from this case.  In *Green*, the Forest Service did not take any action to fight the Bullock Fire on the homeowners' properties "then or later."  *Id.* at 1248.  Thus, the failure to communicate with landowners was not based upon the broader decision to perform, and the subsequent conduct of performing, fire suppression efforts. The factual circumstances here are very different. McKibbin's communication with Willard was not an action separate and apart from the burnout itself.    Instead, McKibbin had a conversation with Willard during the course of preparing to deploy fire defensive measures.    That

---

[7] A "backfire" or "backburn" is a more intense fire than a "burnout," and is intentionally set to change the direction and force of an oncoming wildfire.  This is an extreme firefighting tactic that is typically used only in emergency situations when firefighter safety is at risk.

conversation was critical to whether and how the actual burnout was to be performed.[8]

Accepting as true the factual allegations contained in Appellants' complaint, we conclude as a matter of law that McKibbin's communication with Willard was "based upon the exercise or performance" of choosing how to organize and conduct fire suppression operations, which undisputedly requires the exercise of judgment grounded in social, economic, or political policy. We therefore hold that the government has met its burden of establishing that Appellants' claims fall within the scope of the discretionary function exception.

B

We turn now to whether Appellants' claims are independently barred by the FTCA's misrepresentation exception. The district court concluded that to the extent Appellants' FTCA claims were grounded in allegations that McKibbin lied to Willard about the precautionary measures his team would take in conducting the burnout, the misrepresentation exception applied. We agree.

The FTCA exempts from its coverage claims "arising out of . . . misrepresentation [or] deceit." 28 U.S.C. § 2680(h).

---

[8] The facts of this case are also distinguishable from *Kimball v. United States*, No. 1:12-CV-00108-EJL, 2014 WL 683702 (D. Idaho Feb. 20, 2014) (unpublished). At issue in *Kimball* was whether Forest Service communications and daily briefings advised homeowners to stay away from their properties during the course of the Raines Fire in 2007, and whether those communications were "informational in nature, not policy driven," and therefore not subject to the discretionary function exception. *Id.* at *6. Here, however, the communication with Willard happened as part of the policy decision to conduct the burnout and was intertwined with that decision.

Under this exception, "claims against the United States for fraud or misrepresentation by a federal officer are absolutely barred," *Kim v. United States*, 940 F.3d 484, 492 (9th Cir. 2019) (quotation omitted), including "misrepresentations made willfully [or] . . . negligently," *Snyder & Assocs. Acquisitions LLC v. United States*, 859 F.3d 1152, 1160 (9th Cir. 2017).

"[T]he essence of an action for misrepresentation, whether negligent or intentional, is the communication of misinformation on which the recipient relies." *Block v. Neal*, 460 U.S. 289, 296 (1983). Appellants' allegations fall squarely within this definition. In their arguments below, Appellants framed their theory as one where they suffered a loss (the burning of 15 acres) as a result of Willard's decision to leave the property, made in reliance on McKibbin's intentionally false statement that he would use foam to control the burnout. For example, Willard claimed that, to his detriment, he "relied on BLM Agent Tom McKibbins's [sic] false promise to protect Mr. Willard's land," and "Mr. McKibbin[] deci[ded] to . . . lie to Mr. Willard by promising to spray foam to protect the property, thereby inducing reliance." This is exactly the kind of scenario to which the misrepresentation exception is properly applied. *See Kim*, 940 F.3d at 492–94; *Leaf v. United States*, 661 F.2d 740, 741–42 (9th Cir. 1981) (misrepresentation exception barred claim by aircraft owner for accidental destruction of aircraft leased by the DEA for a covert drug smuggling sting when the owner was told it would be used by "a rock music group for recreational purposes").

Appellants argue that just because "it is alleged, or admitted, that a government actor was deceitful in some respect does not itself put the claim within 28 U.S.C. § 2680(h)." But the alleged misrepresentation in this case is

not collateral to the gravamen of the complaint. Willard claims that absent McKibbin's misrepresentations, Willard would have "come back to save [his] land." By Willard's own account, the alleged misrepresentations are "within the chain of causative events upon which plaintiffs' claim is founded, and thus within the misrepresentation exception." *Leaf*, 661 F.2d at 742. We therefore hold that these claims regarding McKibbin's communication with Willard are independently barred by the FTCA's misrepresentation exception.

IV

Finally, we address whether the district court made improper factual findings in resolving the Rule 12(b)(1) motion and properly denied additional jurisdictional discovery in this case.

First, Appellants assert that the district court erred when it resolved Appellants' negligent communication claims because "the district court 'resolved' for purposes of the motion that one witness had 'lied' . . . ." But the district court made clear that it was not making factual or credibility determinations in resolving the government's Rule 12(b)(1) motion. Contrary to Appellants' argument, the court was not "resolving serious matters of credibility on a summary basis." Instead, the district court was viewing the facts alleged in the light most favorable to Appellants and concluding that, even were it to take those facts as true, the court lacked subject matter jurisdiction over the case. This was not in error.

The district court also did not abuse its discretion in refusing to allow further jurisdictional discovery. While Appellants argue that "the district court should have permitted discovery and fact finding into what

communications were made, whether any of them were made in error or misunderstood, and what other courses of action might have been taken, had the communications been made or understood differently," Appellants have not identified how they were prejudiced by the district court assuming their allegations were true for the purpose of determining jurisdiction. *See Gonzalez*, 814 F.3d at 1032 (holding there was no abuse of discretion in denying jurisdictional discovery where the appellants could not show they were prejudiced). Nor do Appellants explain how it would make a difference to the jurisdictional analysis if McKibbin's statements were made in error given that both the misrepresentation exception and the discretionary function exception protect negligent conduct. *See Snyder*, 859 F.3d at 1160 (exception under § 2680(h) "includes misrepresentations made willfully and misrepresentations made negligently"); *Kennewick Irrigation Dist.*, 880 F.2d at 1029 (declaring that "negligence is simply irrelevant to the discretionary function inquiry").

Accordingly, we hold that the district court did not make improper factual findings in resolving the Rule 12(b)(1) motion and did not abuse its discretion by denying additional jurisdictional discovery.

V

Appellants' claims regarding McKibbin's alleged miscommunication with Willard fall within the scope of the FTCA's discretionary function exception and, alternatively, fall within the FTCA's statutory exception for claims based on misrepresentation or deceit. Further, the district court did not err in accepting the version of the facts alleged by Appellants in order to determine whether it had jurisdiction,

and did not abuse its discretion in denying the request for jurisdictional discovery.

**AFFIRMED.**

Each party shall bear its own costs.