**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| MICHELLE SCHURG; DANIEL SCHURG; CHAD MILLER; BECCIE MILLER; JACKIE LOWE; LARRY A. ERNST; MAUREEN A. ERNST; RONNIE HARVIE; JOLEEN HARVIE; MARK STERMITZ; MICHELLE STERMITZ; BRIAN O'GRADY, *Plaintiffs-Appellants,* <br><br> v. <br><br> UNITED STATES OF AMERICA, *Defendant-Appellee.* | No. 22-35193 <br><br> D.C. Nos. <br> 9:20-cv-00061-DWM <br> 9:20-cv-00062-DWM <br> 9:20-cv-00063-DWM <br> 9:20-cv-00064-DWM <br> 9:20-cv-00065-DWM <br> 9:20-cv-00066-DWM <br> 9:20-cv-00067-DWM <br> 9:20-cv-00090-DWM <br><br> OPINION |

Appeal from the United States District Court
for the District of Montana
Donald W. Molloy, District Judge, Presiding

Argued and Submitted December 5, 2022
Seattle, Washington

Filed March 28, 2023

Before: M. Margaret McKeown, Eric D. Miller, and Holly
A. Thomas, Circuit Judges.

Opinion by Judge McKeown

## SUMMARY[*]

### Federal Tort Claims Act

The panel affirmed the district court's summary judgment in favor of the United States in an action brought by landowners alleging that the U.S. Forest Service is liable under the Federal Tort Claims Act ("FTCA") for failing to comply with its duty to consult with them about fire-suppression activities on or near their properties.

The FTCA's discretionary function exception preserves sovereign immunity as to claims regarding a government employee's "act or omission . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency." 28 U.S.C. § 2680(a).

The panel applied the requisite two-step test to determine whether the discretionary function exception applied. First, the panel examined whether there was a federal statute, regulation, or policy that prescribed the Forest Service's course of action regarding the agency's communications with the landowners during the Lolo Peak fire in the Bitterroot Mountains in Montana in July 2017. The published incident decision in place for the Lolo Peak fire contained an instruction, included in the "objectives" section

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

of the incident decision, directing the Forest Service to "[c]onsult with private landowners and local fire district authorities if suppression activities have a high probability of occurring on private lands." The objective did not dictate when or how the Forest Service was to consult with private landowners and did not require the Forest Service to consult with landowners individually. The panel held that the Forest Service's specific communications with the landowners exceeded the incident decision's instruction and involved an element of judgment or choice sufficient to satisfy the first step of the discretionary function exception.

Second, the panel examined whether the Forest Service's decisions related to consulting with landowners about fire-suppression activities on and near their land were based on social, economic, and political policy. The panel held that the Forest Service's decisions about notifying the landowners about fire-suppression activities likely to occur on and near their properties were susceptible to a policy analysis. The panel concluded that determining how to consult with private landowners while the Lolo Peak fire raged was precisely the type of decision the discretionary function exception was designed to shield, and the landowners' claims were thus barred by the discretionary function exception. Accordingly, the district court properly granted summary judgment for the Forest Service on all of the landowners' claims.

**COUNSEL**

Kris A. McLean (argued), Tyson A. McLean, and Jordan A. Pallesi, Kris A. McLean Law Firm PLLC, Missoula, Montana, for Plaintiffs-Appellants.

John M. Newman (argued), Mark S. Smith, and Randy J. Tanner, Assistant United States Attorneys; Jesse A. Laslovich, United States Attorney; Office of the United States Attorney, Missoula, Montana; for Defendant-Appellee.

**OPINION**

McKEOWN, Circuit Judge:

The Lolo Peak fire tore through western Montana in the summer of 2017. From July to September, the fire destroyed multiple homes and buildings and required over 750 households to evacuate. The United States Forest Service, together with the Montana Department of Natural Resources and Conservation, managed the rapidly changing fire conditions and actively communicated with the public about the fire. After the fire, various affected landowners sued the federal government. They claim that the Forest Service is liable under the Federal Tort Claims Act ("FTCA") for failing to comply with its duty to consult with them about fire-suppression activities on and near their properties. Specifically, they argue that the Forest Service was required to consult with landowners through individualized—rather than public—communication channels.

This case calls on us to consider the bounds of the discretionary function exception to the FTCA. The district court granted summary judgment for the Forest Service, holding that it lacked subject matter jurisdiction because the property owners' claims were barred by the discretionary function exception. We affirm.

## I. BACKGROUND

In July 2017, a lightning strike in the Bitterroot Mountains near Lolo, Montana ignited the Lolo Peak fire. Hot, dry weather in western Montana throughout the summer created dangerous fire conditions, posing an extreme risk to firefighters and residents. The fire, fueled initially by steep, heavily timbered terrain that prevented firefighters from engaging safely, burned for nearly three months. Appellants are landowners with homes in the Macintosh Manor subdivision plus one individual, Brian O'Grady, who owns undeveloped land, collectively "the landowners." Their property was damaged during the Lolo Peak fire.

Shortly after the fire started, the Lolo National Forest Supervisor requested the help of a fire team capable of handling Type 1 incidents. Type 1 incidents are highly complex, difficult to stabilize, consume significant resources, pose a danger to neighboring populations, and demand a high level of public communication. The Forest Service and Montana Department of Natural Resources and Conservation delegated the Type 1 incident management team "full authority and responsibility for fire management activities." The primary duty of the team was to manage and direct resources for "safe, efficient and effective management of the fire," with additional responsibility to communicate internally and with the public about the fire.

The team used the Wildland Fire Decision Support System—an online program that allows fire teams to monitor weather, model possible fire behavior, access fire-related information technology, view applicable fire-management plans, and more—to make strategic and tactical fire-related decisions. The team prepared and published incident decision reports on the Wildland Fire Decision Support System platform. The first incident decision was published in late July 2017 and updated in early August 2017 after the fire spread significantly. The decision included contingencies to help the team act quickly if the fire reached certain geographic locations and provided general guidelines for public communication. In particular, the updated decision stated that the team was required to "[c]onsult with private landowners and local fire district authorities if suppression activities have a high probability of occurring on private lands."

As part of its public-information function, the team developed a multi-faceted communication strategy for the fire designed to reach as many members of the public as possible. For example, the team held in-person meetings at local schools and churches and visited high-traffic areas such as supermarkets, gas stations, and post offices daily to disseminate print information and answer questions. On a Facebook page developed specifically for the Lolo Peak fire, the team posted updates and livestreamed public meetings. The team posted daily about the fire on InciWeb, a public, online platform for sharing incident-related information. Community members could receive fire updates by visiting the team's information trailer, sending questions to a fire-specific email account, and following the daily press releases the team provided to print, television, and radio outlets. The team decided to favor technology-based communication

methods over slower, more individualized methods given the number of residents in proximity to the fire, the community's sophistication, and the "widespread availability of internet access."

By early August, the fire had spread substantially and spanned over 5,000 acres. Daily posts on InciWeb, as well as other communication methods, informed the public about the direction of fire growth and about the fire retardant, aerial ignition, and fire-control lines the team was using for mitigation and containment. Despite the team's numerous efforts, the fire reached O'Grady's undeveloped, forested land in mid-August. Based on the fire's rampant spread and strong wind conditions, the team decided to conduct firing operations, which involved burning fuels to stop the fire's growth and "limit impacts to fire severity to vegetation," on O'Grady's property on August 14. On InciWeb, the team explained that firefighters were executing firing operations and "carefully introducing fire in unburned areas," or "fighting fire with fire[] to slow the advance of the fire front." O'Grady learned that the fire had reached his property by checking InciWeb, which he did "most days."

In the days that followed, low humidity and strong winds increased the fire's intensity as it spread rapidly toward the Macintosh Manor subdivision, where the remainder of the landowners owned homes. On August 16, the fire burned 4,000 acres and crossed a geographic location listed in the published incident decision, triggering evacuation orders and signaling danger to Macintosh Manor. The team determined that conducting firing operations to slow the spread of the fire, although hazardous to residents in the area, presented the best opportunity for containment. During the morning of August 17, the team updated InciWeb to report the raging fire conditions, explain that the team dropped

retardant from aircraft to slow the fire's spread, and notify the public of the team's plan to conduct firing operations by the afternoon. The team also held a public meeting on August 17, staffed an information trailer in the community, and used other technology-based communication methods to disseminate information. The burnout operations began that day, but the fire nonetheless reached Macintosh Manor that evening. Despite the team's mitigation attempts, the fire destroyed two homes and several accessory structures.

In the aftermath, O'Grady and several Macintosh Manor residents brought negligence and intentional tort claims against the Department of Agriculture and the Forest Service. They argued that, based on the published incident decision, the Forest Service was required to consult them personally about the fire-suppression activities that occurred on their properties but that it failed to do so. They further claimed that the Forest Service intended the suppression activities to cause fire damage on their properties. The district court held that the discretionary function exception to the FTCA barred the claims and granted summary judgment for the Forest Service.

## II. ANALYSIS

Under the FTCA, district courts have jurisdiction over claims against the United States for money damages "for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission" of any government employee "acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). The United States has waived its sovereign immunity for certain tort

claims under the FTCA, and parties can sue the government only where sovereign immunity is waived.  *Esquivel v. United States*, 21 F.4th 565, 572–73 (9th Cir. 2021).  We review *de novo* the district court's determination that it lacks subject matter jurisdiction under the FTCA.  *Id.* at 572.

The FTCA's discretionary function exception preserves sovereign immunity as to claims regarding a government employee's "act or omission . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency" or government employee.  *Id.* at 573 (quoting 28 U.S.C. § 2680(a)).  The Supreme Court has crafted a "two-step test to determine whether the discretionary function exception" applies.  *Id.*  Courts must determine whether (1) "the challenged actions involve an 'element of judgment or choice'" and, if so, whether (2) the "judgment is of the kind that the discretionary function exception was designed to shield."  *Id.* at 573–74 (first quoting *United States v. Gaubert*, 499 U.S. 315, 322 (1991); and then quoting *Berkovitz v. United States*, 486 U.S. 531, 536 (1988)). The federal government is immune from suit if the challenged action satisfies both steps.  *Id.* at 574.  If so, "federal courts lack subject matter jurisdiction" over the dispute, "even if the court thinks the government abused its discretion."  *Id.*

At the first step, we must "determine whether a federal statute, regulation, or policy mandated a specific course of action, or whether the government actor retained an element of judgment or choice with respect to carrying out the challenged action."  *Green v. United States*, 630 F.3d 1245, 1249 (9th Cir. 2011).  We focus on the "nature of the conduct, rather than the status of the actor," and a government employee's action is nondiscretionary where it is specifically prescribed by "a federal statute, regulation, or

policy." *Esquivel*, 21 F.4th at 573 (quoting *Berkovitz*, 486 U.S. at 536). If there is an "element of judgment or choice," we proceed to the second step and ask whether the government actor's action or inaction was "based on considerations of public policy," which are "the kind that the discretionary function exception was designed to shield." *Green*, 630 F.3d at 1249 (quoting *Terbush v. United States*, 516 F.3d 1125, 1129 (9th Cir. 2008)). The landowners bear the "burden of showing there are genuine issues of material fact as to whether the exception should apply, but the government bears the ultimate burden of establishing that the exception applies." *Esquivel*, 21 F.4th at 574 (quoting *Green*, 630 F.3d at 1248–49).

This is not the first time we have addressed the discretionary function exception in the context of forest fires. Most recently, in *Esquivel v. United States*, we held that the Forest Service's actions fell within the discretionary function exception when a wildfire threatened private property and a fire crew obtained a resident's verbal consent before starting suppression activities, but the crew's fire-suppression activities damaged the property. *Id.* at 570–72. At the first step, the Forest Service's communication with the landowners involved an element of choice because no statute, regulation, or policy contained mandatory language regarding landowner communication, and the governing Forest Service manual provided that "reasonable discretion in decision-making may be required" because of the "dynamic, chaotic, and unpredictable" nature of wildfire. *Id.* at 574–75. At the second step, the landowner communication was part of the Forest Service's choice of "how to organize and conduct fire suppression operations, which undisputedly requires the exercise of judgment

grounded in social, economic, or political policy." *Id.* at 577.

We reached a similar conclusion in *Miller v. United States*, holding that the presence of mandatory language in Forest Service documentation, such as a directive to "apply aggressive suppression action to wildfires that threaten assets," did not "eliminate discretion" because it did not tell the Forest Service "how to fight the fire." 163 F.3d 591, 594–95 (9th Cir. 1998). Additionally, the Forest Service's decision-making related to managing multiple fires was susceptible to a policy analysis because it required the agency to "balance competing concerns" such as public safety, environmental protection, and resource management. *Id.* at 596.

After *Miller* but before *Esquivel*, in *Green v. United States*, we held that the discretionary function exception did not apply in one circumstance where the Forest Service performed fire-suppression activities near landowners' property, "did not take any action to protect" the property, and did not inform the landowners about its suppression efforts. *See* 630 F.3d at 1247–48. Although the applicable Forest Service manual directed the agency to ensure the public was informed about fire-suppression efforts, the Forest Service's communication decision—or lack thereof—involved an element of choice because the manual did not "prescribe a mandatory course of action." *Id.* at 1250. The Forest Service's actions were not susceptible to a policy analysis, however, because there was no evidence that the agency had to determine how to allocate resources between firefighting and public communications. *See Green*, 630 F.3d at 1250–52. We explained that without evidence that the Forest Service had to make a policy decision about landowner communication "during

firefighting operations," such as a choice between community distribution methods and "direct contact with private citizens," the Forest Service could not meet the second step of the discretionary function exception. *Id.* at 1252.

As in *Esquivel* and *Green*, the landowners here challenge the Forest Service's communications with them regarding its fire-suppression activities. Because the Forest Service's communication involved an element of judgment or choice and was susceptible to a policy analysis, the discretionary function exception to the FTCA applies and bars their claims.

## A.  Element of Judgment or Choice

The first step of the discretionary function exception test asks "whether there was a federal statute, regulation, or policy in place that specifically prescribed a particular course of action by the Forest Service" regarding the agency's communication with the landowners during the Lolo Peak fire. *See Miller*, 163 F.3d at 594. "An agency must exercise judgment or choice where no statute or agency policy dictates the precise manner in which the agency is to complete the challenged task." *Green*, 630 F.3d at 1250. If a statute or policy directs "mandatory and specific action," however, there can be no element of choice. *Terbush*, 516 F.3d at 1129.

The published incident decision in place for the Lolo Peak fire directed the Forest Service to "[c]onsult with private landowners and local fire district authorities if suppression activities have a high probability of occurring on private lands." The instruction to consult with private landowners appeared in the "objectives" section of the incident decision alongside directives to avoid using aerial

fire retardant in areas with endangered species and to ensure "media messages are accurate." Additionally, a letter from the team leadership specified that the team could not deviate from the published incident decision without issuing a new decision.

Neither the objective to consult with private landowners nor the team letter is a "federal statute, regulation, or policy in place that specifically prescribed a particular course of action by the Forest Service." *See Miller*, 163 F.3d at 594. The objective did not dictate when or how the Forest Service was to consult with private landowners and did not require the Forest Service to consult with landowners individually. *See Green*, 630 F.3d at 1251 (holding that a plan requiring the Forest Service to develop a map of private land and record landowners' contact information was a mere "objective" involving an element of choice because it did not "dictate[] the precise manner in which the agency [was] to complete the challenged task"). In the absence of such directives, the Forest Service necessarily had to choose the best way to publicize information about the fire. Its decision to do so mainly through technology-based methods like InciWeb posts was central to its responsibility to manage the fire and ensure public safety. That the incident decision does not define "suppression activities" or "high probability," allowing the Forest Service discretion to determine when the likelihood of fire-suppression activities on private land warranted landowner consultation, further supports that the "consult with private landowners" instruction involved an element of judgment or choice. *See Miller*, 163 F.3d at 594–95.

The Forest Service's actions more than rose to the level of consulting with private landowners. The Forest Service's numerous communications with the public included

InciWeb and Facebook posts, in-person and broadcast community meetings, daily press releases to media outlets, information distribution in high-traffic areas, and more. The specific communication with the landowners, including InciWeb posts regarding fire-suppression activities on and near Macintosh Manor and O'Grady's undeveloped land, exceeded the incident decision's instruction and involved an element of judgment or choice sufficient to satisfy the first step of the discretionary function exception.

## B.  Considerations of Public Policy

The pertinent question at the second step of the discretionary function exception test is whether the Forest Service's decisions related to consulting with landowners about fire-suppression activities on and near their land were based on "social, economic, and political policy." *See Esquivel*, 21 F.4th at 574 (citing *Berkovitz*, 486 U.S. at 537). "The challenged decision need not be actually grounded in policy considerations, but must be, by its nature, susceptible to a policy analysis." *Green*, 630 F.3d at 1251 (quoting *Miller*, 163 F.3d at 593).

The Forest Service's decisions about notifying the landowners about fire-suppression activities likely to occur on and near their properties are susceptible to a policy analysis. To begin, the choice to post on InciWeb about fire-suppression activities on and near Macintosh Manor and O'Grady's undeveloped land instead of talking directly with the landowners "involved a balancing of considerations." *Miller*, 163 F.3d at 595. The Forest Service had to balance the team's safety during a time of worsening fire conditions in mid-August 2017 with the time-intensive nature of reaching members of the public on a personalized basis. Its decision was informed by "the widespread availability of

internet access and the public's sophistication" in the areas surrounding the fire. As we have previously held, "[t]hese considerations reflect the type of economic, social and political concerns that the discretionary function exception is designed to protect." *Id.*

The Forest Service's communications about its fire-suppression activities "were part of the decision to set, and the subsequent conduct of, the burnout—which is undisputedly a policy-based decision covered by the discretionary function exception." *See Esquivel*, 21 F.4th at 576. We explained in *Esquivel* that "communication between fire crews and property owners is . . . covered by the discretionary function exception" where the communication is "based upon the performance of fire suppression operations." *Id.* The in-person conversation between the fire crew and the resident in *Esquivel* was susceptible to a policy analysis because the conversation "concerned how to organize and conduct suppression operations." *Id.* The same reasoning applies here. For example, the Forest Service's decision to post on InciWeb and use other technology-based methods to notify landowners about the fire-suppression activities on and near their properties instead of talking with them directly was related to its decision about "whether, where, and how to set and manage" the fire-suppression activities. *See id.* The team decided to conduct firing operations, used technology to communicate with the landowners about the firing operations, and focused its resources on engaging the fire. As in *Esquivel*, the communication about the fire-suppression activities was not "separate and apart" from the fire-suppression activities themselves. *Id.* at 577.

The landowners' efforts to invoke *Green* to argue that the Forest Service's communication was not susceptible to a

policy analysis fall short.  There, we found no evidence that the Forest Service had to choose how to allocate resources between fire management and public communication. *Green*, 630 F.3d at 1252.  We explained that an example of the kind of resource allocation susceptible to a policy analysis—deciding "between community-wide distribution (such as newspapers and radio stations) and direct contact with private citizens (such as phone calls or door-to-door contacts)"—was absent.  *Id.*  Here, in contrast, the Forest Service made policy and resource choices based on the sophisticated nature of the community and the need to focus resources on fire management.  Regrettably, the Forest Service in *Green* made no effort to communicate with landowners about its fire-suppression activities.  *See id.* at 1248.  The policy decisions missing in *Green* are present here.

The Forest Service's communication with the landowners about fire-suppression activity that had a high probability of occurring on or near their land satisfies both steps of the discretionary function exception.  Determining how to consult with private landowners while the Lolo Peak fire raged is precisely the type of decision the discretionary function exception was designed to shield, and the landowners' claims are thus barred.  Accordingly, the district court properly granted summary judgment for the Forest Service on all of the landowners' claims.

**AFFIRMED.**